UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley SPIEGEL, Allen E. Perkins and
Allan Holloway, Defendants-Appellants.

No. 78–5110.

United States Court of Appeals,
Fifth Circuit.

Oct. 18, 1979.

Edward T. M. Garland, Mark J. Kadish, Atlanta, Ga., for Spiegel.

J. Roger Thompson, Frank J. Petrella, Atlanta, Ga., for Perkins and Holloway.

William P. Gaffney, Asst. U.S. Atty., Dept. of Justice, Atlanta, Ga., for plaintiff-appellee.

Before GODBOLD, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

Appellants were indicted and tried on 30 counts[1] of mail fraud under 18 U.S.C. § 1341, and one conspiracy count under 18 U.S.C. § 371. Following a trial lasting nine weeks, the jury found appellant Stanley Spiegel guilty of all 30 counts of mail fraud. Appellant Allan Holloway was found guilty of 25 counts of mail fraud; and appellant Allen Perkins was found guilty of one count of mail fraud and acquitted of all others. The jury acquitted all three of the conspiracy charges and acquitted two codefendants of all charges. Spiegel, Holloway, and Perkins appeal from their convictions. Appellant Spiegel's brief argues for reversal on 24 separate issues; the brief for Holloway and Perkins raises 15 issues. The transcript of proceedings in the trial court fills over 50 volumes. We granted additional time for oral argument and gave permission to file briefs more lengthy than usual.

It should be obvious that this is a complex case. Any summary of facts will be less revealing than an iceberg's proverbial tip. With that disclaimer, we now attempt to sketch the most important details while saving for our discussion of the more troubling issues a description of the events especially relevant to them.

Appellant Spiegel, a successful acquisition broker, bought the controlling interest in Coliseum Properties, Inc. (CPI) in October 1970 with notes totalling approximately $460,000. Spiegel and Holloway soon thereafter formed Leasing Corporation of America (LCA) as a CPI subsidiary. At about the same time, Spiegel and acquitted codefendant Joseph Lawson formed another CPI subsidiary, Auditing Services, Inc. (ASI). Holloway, through Holloway Enterprises, Inc. (HEI), contracted with CPI to sell franchises for both ASI and LCA.

LCA offered franchises to persons interested in entering the leasing business. Essentially, prospective dealers were told that LCA had access to 200 funding sources and could obtain financing for leases on almost any type of income-producing equipment, even on marginal lease applications. The sales pitch to prospective dealers furnished, amid other questionable information, the names and phone numbers of allegedly successful dealers. Franchise salesmen solicited a $2,500 down payment with a completed dealer application. Following approval of the application, the remainder of the $10,000 franchise fee became due. Dealers who paid in full received, by mail from Spiegel, a signed dealer agreement. A total of 34 LCA franchises were sold between December 1970 and December 1971; LCA received $365,000 in cash from those sales under its agreement with HEI that LCA and HEI would split the fees 60/40. Over 130 leases were submitted to LCA by dealers during 1971. Only four were placed successfully.

---

1. The indictment alleged 32 counts; two were dismissed at the close of the government's case-in-chief.

ASI offered computerized audits of utility expenses to businesses and industries. It sold franchises allowing solicitation of customer accounts in defined territories. Prospective dealers were told that utility rates from each dealer territory were programmed into the computer and that auditing by computer was the major advantage offered by ASI. Businesses for whom audits were done were to pay 50 percent of any refunds or utility savings to the dealer, who then was to share half his profits with ASI. To aid its franchise sales, ASI used photographs of computer facilities depicting an RCA computer and, later, tours of another facility. As with LCA sales, prospects were furnished the names and addresses of purportedly successful dealers. ASI received over $650,000 as its share of the fees from 62 franchise sales in 1971; HEI received over $225,000. Franchisees submitted many auditing contracts, but few recoveries resulted, although ASI had represented that the recovery rate would be very high.

Appellant Perkins was a paid "singer" for both LCA and ASI; *i. e.*, he posed as a successful dealer and deceived prospective dealers by representing that he was receiving significant income from his "franchises." Spiegel and Holloway were aware of the use of "singers."

Evidence showed that LCA misrepresented the extent of its funding sources. Holloway prepared the LCA pitch book in Spiegel's presence, and Spiegel had ample opportunity to learn its contents. Spiegel confirmed, in a telephone call to a prospective dealer, that LCA could handle marginal paper and had 200 funding sources. Additionally, Spiegel sent backdated franchise agreements to "singers" Perkins and Jim Arnold knowing that no fees had been paid for their "franchises."

Spiegel and Holloway misrepresented the state of ASI's computer capability. Their computer expert told Spiegel in April 1971 that the rate structure of an entire utility company could not be programmed; analysis had to proceed one business at a time. When advised of this and when told such information would ruin the sales pitch, Spiegel indicated that ASI salesmen need not receive this information. Despite advice that franchise sales should stop, owing to a backlog at the computer, sales continued. Spiegel also misrepresented to a dealer that ASI had leased three-fourths of the time available on an RCA computer at an annual cost of $500,000.

■ From the foregoing and other facts proven at trial, we think it clear that the jury verdicts of fraud are supported by substantial evidence. We now proceed to consider the more serious points raised on appeal.

### Eleven-Member Jury

Appellants contend that the trial court committed reversible error by excusing juror Suzanne Silver and continuing the trial with only eleven jurors. We disagree.

Two distinct provisions of the United States Constitution guarantee the right to a jury trial in criminal cases.[2] The Supreme Court declared in 1930 that the Constitution required a jury of precisely twelve persons unless this right was waived by defendant. *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). The Federal Rules of Criminal Procedure, enacted in the 1940's, codified *Patton's* requirement of twelve.[3] Our first inquiry thus must be whether Rule 23(b) has been followed here.[4]

2. U.S. Const. art. 3, § 2, cl. 3, provides: "The trial of all crimes . . . shall be by Jury . . . ." The sixth amendment states: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

3. *See* Note of the Advisory Committee on Rules following Rule 23 in 18 U.S.C.A.

4. Rule 23(b), Fed.R.Crim.P., reads as follows:

Jury of Less Than Twelve. Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences.

At a pretrial conference on June 3, 1974, attended by all counsel and appellant Spiegel, the question whether counsel and parties would be amenable to waiving the requirement of twelve jurors was first raised but not resolved. The jury was selected and sworn a week later, on June 10. After voir dire and before actual selection, all counsel for defendants stated, at side-bar, that their clients would waive the right to have twelve jurors.[5] Additionally, it was agreed at side-bar that two alternate jurors would be selected, despite the waiver, simply as a matter of preference. After a recess to discuss peremptory strikes and after the final selection, counsel for the government and for all defendants signed a written stipulation waiving the requirement of twelve jurors, and the trial judge announced in open court: "The court has received and approved the waiver of an alternate juror and the agreement to proceed with less than twelve in the event of necessity." There is nothing in the record to indicate conclusively that defense counsel conferred with their clients before signing the stipulation.

Soon after trial began, two jurors were excused, and the two alternates replaced them. Trial continued for approximately two more months. The government's case took seven weeks; defendants began theirs on August 5. Defendants wished to finish as soon as possible, since the jury was becoming restless and impatient. Defendant Spiegel was on the stand at the close of the day on Friday, August 9, his case complete except for cross-examination.

On Monday following the weekend recess, juror Silver did not report, owing to illness. Evidently the deputy clerk advised counsel of this new development before the judge entered the courtroom. On his arrival, the trial judge formally announced that juror Silver was ill, and he expressed uncertainty about when she would return. At that point, all defense counsel, in the presence of their clients, *requested* that trial continue with the remaining eleven jurors; government counsel objected. The trial court then excused the juror and stated in defendants' presence that trial would proceed with eleven. Again, it is difficult to ascertain whether appellants were consulted by their attorneys before the latter made their request to proceed. Much later, in overruling motions for new trial, the trial court stated that defendants "either knew actually the substance of their rights [to a twelve-person jury], or committed the entire decision without regard thereto to their attorneys." Thus, he made no explicit finding that defendants knew exactly what was being waived on either June 10 or August 12. Unquestionably, none gave personal assent in court to trial by eleven jurors.[6]

The real issue is whether Rule 23(b) allows counsel to waive a client's right to a jury of twelve in the absence of a finding that defendant either was consulted about the decision or personally and intelligently assented to fewer than twelve.[7]

The language of Rule 23(b) departs substantially from that of Rule 23(a). The latter states:

Trial by jury. Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.

Rule 23(b), on the other hand, refers not to "the defendant" but to "the parties."[8]

---

5. There is some indication that the decision to waive was made in order to obtain five additional peremptory challenges.

6. We wish to emphasize here that no one suggests that defendants were displeased with their counsels' decisions to agree in advance to trial by less than twelve jurors and to proceed with eleven on August 12. Indeed, some defendants seem to have expressed elation, off the record, over juror Silver's dismissal.

7. The requirement of a writing in Rule 23(b) is not at issue here, since it is clear that a defendant's oral consent given in open court satisfies the rule even where its requirements are strictly enforced. *See United States v. Smith,* 523 F.2d 788 (5th Cir. 1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1475, 47 L.Ed.2d 742 (1976); *United States v. Guerrero-Peralta,* 446 F.2d 876 (9th Cir. 1971).

8. *See* note 4, *supra.*

Several courts apparently are reluctant to give meaning to this difference and require the express, knowing, intelligent, *personal* consent of defendant to a stipulation that trial may proceed with fewer than twelve jurors. *See United States v. Taylor*, 498 F.2d 390 (6th Cir. 1974); *United States v. Guerrero-Peralta*, 446 F.2d 876 (9th Cir. 1971). Another court holds that Rule 23(b) is satisfied if counsel is shown to have consulted with the defendant before agreeing to proceed with eleven jurors. *United States v. Vega*, 447 F.2d 698 (2d Cir.), *cert. denied*, 404 U.S. 1038, 92 S.Ct. 712, 30 L.Ed.2d 730 (1971). The Seventh Circuit, on the other hand, allowed counsel's signature on a stipulation consenting to fewer than twelve jurors to bind his client, despite the record's silence on the defendant's authorization or consent and even though counsel later objected to implementation of the stipulation. *United States v. Pacente*, 503 F.2d 543 (7th Cir.) (en banc), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974).

Precedent in our own circuit leaves us in some doubt as to which of the above lines of cases we should follow. In *Horne v. United States*, 264 F.2d 40 (5th Cir.), *cert. denied*, 360 U.S. 934, 79 S.Ct. 1460, 3 L.Ed.2d 1549 (1959), a collateral proceeding under 28 U.S.C. § 2255, defendant was held to have waived his right to twelve jurors through acts of his *counsel*, who first agreed to begin trial without alternate jurors, then stipulated in advance that the defense would be willing to proceed with fewer than twelve if any jurors became unable to continue, and finally agreed to the dismissal of a sick juror when the occasion in fact arose. The *Horne* court found no evidence of defendant's express consent to any of these actions by counsel but stated that defendant, although "unaware of the exact colloquy between Court and counsel, knew that the matter was discussed . . . and made no objection." *Id.* at 42. In those circumstances, which are very like ours here, the trial court "had every right to conclude that the action openly taken on both occasions by petitioner's counsel . . . was, as in the usual case, the act of petitioner." *Id.* at 43 (citations omitted).

■ This court in *Horne* reached the above holding with an eye toward both Rule 23(b) and *Patton's* constitutional equation of "jury" with twelve persons. Thus, we can infer from *Horne* that a waiver made by counsel of the right to a twelve-person jury after intelligent and deliberate discussion in open court satisfies Rule 23(b) and passes constitutional muster.[9] This court later followed *Horne* without discus-

9. A recent development has, if anything, strengthened *Horne's* holding. *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), in holding that the fourteenth amendment does not require *states* to provide twelve-person juries, cast doubt via broad dicta on whether the Constitution mandates twelve-person juries in federal court and perhaps overruled *Patton* sub silentio. Even if the number twelve is still constitutionally dictated, however, we find numerous circumstances in which actions by counsel to waive constitutional rights have bound their clients. *See, e. g., Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (waiver by counsel of fourteenth amendment guarantee that accused cannot be compelled to stand trial in prison garb); *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) (deliberate choice by counsel to delay objection to tainted evidence may waive defendant's rights under the fourth amendment); *Winters v. Cook*, 489 F.2d 174 (5th Cir. 1973) (intentional, strategic waiver by counsel of defendant's right to object to racial composition of jury).

*Winters* relates a basic truth: we guard so zealously the right to counsel because

most defendants are untutored in the law and are unqualified to conduct their own defense. It would be incongruous to reflexively allow a defendant such as Winters to void his conviction when his privately-employed lawyer did what he was retained to do—use his skill and knowledge of the law to further the best interests of his client—because the lawyer did not first reason out his every action with his client and obtain his knowing agreement.

*Id.* at 177–78. Only where there is evidence of fraud or gross incompetence by an attorney—which is not an issue here—or where "an inherently personal right of fundamental importance is involved," *id.* at 178, does the law require defendant to personally waive his or her rights. *Horne*, even before *Williams v. Florida*, indicated that defendants sometimes could speak through counsel in waiving the right to twelve-person juries. This in no way suggests that counsel may waive the right to a *jury trial* for their clients.

sion in a direct appeal. *Beatty v. United States*, 377 F.2d 181 (5th Cir.), *rev'd on other grounds*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967).

Only our recent decision in *United States v. Smith*, 523 F.2d 788 (5th Cir. 1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1475, 47 L.Ed.2d 742 (1976), stands in the way of our holding that the agreements entered into by counsel in this case satisfy Rule 23(b). *Smith* appears to require the express, personal consent of the defendant before a jury of less than twelve can convict; *i. e.,* the court followed the Ninth and Sixth Circuits. However, *Smith* overlooked *Beatty* and *Williams v. Florida* entirely, and *Horne's* precedent apparently was thought not to be on point. *See* 523 F.2d at 791 n. 1.

■ We are reluctant to find that *Smith,* through possible inadvertence or inadequate briefing, overruled *Horne* and *Beatty* sub silentio. Yet even if we assume that to be so, the facts of this case sufficiently distinguish it from *Smith* and require a finding of waiver. Appellants here affirmatively *sought,* as a matter of trial strategy, through counsel, the dismissal of juror Silver. In *Smith,* defense counsel and defendant seemed reluctant to implement the stipulation when the need for it arose; this court thus was forced to examine defendant's consent closely, since no strategy by defendant appeared to be involved. Counsel here made a tactical decision and urged it on the trial judge over the prosecution's protest; that conduct served to waive any objection the appellants might have had to proceeding with eleven jurors. We would also point out that, if we were to find the dismissal to be error under *Smith,* we would also be constrained to call it invited error. *See United States v. Lewis,* 524 F.2d 991 (5th Cir. 1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976).

### Replacement of Two Jurors with Alternates

The government's voir dire questions failed to inquire whether any on the jury

panel knew the defendants or their families. On June 11, 1974, the day after the jury was sworn, the deputy clerk advised the trial judge that juror Helen McSwain had told him that she knew appellant Spiegel. The trial judge in turn announced this in open court; trial proceeded without objection. The next day, the arrival of Spiegel's family at court prompted juror McSwain to communicate directly with the trial judge at the noon recess concerning her relationship with the Spiegels. The judge then asked her in open court, out of the jury's presence, to relate her feelings about serving on the jury. She said that she knew the Spiegels and would rather not be on the jury since should would be uncomfortable making a decision in the case.[10] She testified that she had told other jurors of her acquaintanceship.

The court then questioned another juror, Harvey Jones, who stated that he had known Spiegel's daughter in college; he too, had mentioned that fact to other jurors.

The trial judge and counsel spent the afternoon of June 12 researching the proper course of action to take under the circumstances; then, and again the next day, they discussed the issues at length. At last the court excused McSwain because he believed her discomfort would render it difficult for her to be an impartial juror. Jones stated that his relationship with the daughter was not a close one, whereupon counsel for Spiegel informed the court that Jones in fact had dated Leslie Spiegel more than once. The court then excused Jones and replaced him and McSwain with two alternate jurors.

Rule 24(c), Fed.R.Crim.P., governs a trial judge's action in such circumstances. It states in pertinent part:

Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to con-

---

**10.** Further questioning by the trial court on June 13, after he excused her, brought out the fact that Ms. McSwain had been a close friend of Spiegel's daughter, Leslie, in junior high school and had been a guest in the Spiegel home.

sider its verdict, become or are found to be unable or disqualified to perform their duties.

It is clear that the court carefully considered the effect of the jurors' relationships with the Spiegels on their ability to remain impartial. The decisions of this court and other circuits indicate that Rule 24(c) empowers a trial judge, exercising sound discretion, to "remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *United States v. Smith*, 550 F.2d 277, 285 (5th Cir.), *cert. denied, sub nom. Wallace v. United States*, 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977) (quoting from *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972); *see also, e. g., United States v. Brown*, 571 F.2d 980 (6th Cir. 1978); *United States v. Jones*, 534 F.2d 1344 (9th Cir. 1976); *United States v. Domenech*, 476 F.2d 1229 (2d Cir. 1973).

None of the cases cited above dealt with the situation presented with McSwain: excusal of a juror during trial for cause based on facts that would have been known before selection but for the *government's* omission of a question on voir dire.[11] Rule 24(c) does not explicitly require that jurors be retained in that circumstance, however, and we believe precedent indicates that the trial judge's discretion is broad enough to cover this case.

Assuming arguendo that the trial judge erred, at least in dismissing Jones, who insisted that his relationship with Leslie Spiegel would not prejudice his judgment,[12] we still must uphold the court's action absent a showing of prejudice to defendants in the substitution. *United States v. Bad Cob*, 560 F.2d 877 (8th Cir. 1977); *United States v. Floyd*, 496 F.2d 982 (2d Cir. 1974).

Counsel for defendants contended at trial, and renew the contention here, that dismissal of McSwain and Jones would prejudice the rest of the jury against defendants by causing the jury to believe the defense guilty of impropriety in not advising the court of the two jurors' knowledge of the Spiegels. In light of the fact that some jurors knew the reason for the substitutions, defense counsel requested that the jury be told that what had occurred did not reflect badly on the defense and that the replacement was due to prosecutorial error. Appellants also contend that the court should have questioned the rest of the jury about whether they had become prejudiced as a result of the replacements.

The trial judge must walk a tightrope in circumstances like these. Rule 24(c) requires the judge to remove jurors when it appears that they cannot perform their duties properly. If, as here, other jurors have some knowledge of what the problem is, the judge must somehow ascertain whether the panel is prejudiced without intimidating them or infecting them with erroneous impressions. We believe the trial court successfully negotiated the tightrope here by his questions to the excused jurors and with his instruction:

Ladies and gentlemen of the jury, two jurors, Mr. Jones and Ms. McSwain, brought to the Court's attention voluntarily and out of a regard for their oaths as jurors matters occurring—a situation affecting knowledge which came to their attention after the jury had been selected and we have excused them and placed the two alternate jurors in their place. The Court wishes to emphasize that what the two jurors did was with entire propriety and commendable and in accordance with their oaths as jurors and the Court knows that each of you jurors are equally faithful to your oaths as jurors.

---

11. Questioning of Jones on June 13 revealed that he was unaware that he knew anyone in the case until he saw defendant's daughter Leslie come into the courtroom the previous day. Thus, the government's failure at voir dire to inquire into the panel's knowledge of the de-

fendants is irrelevant as it concerns juror Jones.

12. Jones' lack of complete honesty probably led the judge, quite properly, to give little credibility to his protestations of fairness.

A further instruction on defense propriety or prosecutorial omissions, or questioning of the panel, might have injected the very prejudice everyone sought to avoid. *See United States v. Brown,* 571 F.2d 980 (6th Cir. 1978).

■ We would also point out that the defense, concerned though it was over jury prejudice, failed when given an opportunity after the verdict to question jurors about the effects on them of the dismissal of the two jurors.[13] Thus, we must hold that the defense has failed to show prejudice to them, and we will presume none.

### Mann Charge

The trial judge gave an erroneous instruction to the jury; it read:

Now it is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted and, *unless the contrary appears from the evidence,* you, the jury, may draw the inference that the accused whose case you are considering intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused.

(emphasis added). We have condemned the use of the italicized words on numerous occasions, beginning with *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). The long history of some trial courts' continued use of the *Mann* charge, and our occasional affirmances despite it, are detailed in *United States v. Chiantese,* 560 F.2d 1244 (5th Cir. 1977) (en banc). In *Chiantese* we declared that we would no longer absolve such errors by looking at the whole charge to find corrective language. However, *Chiantese* is to be applied only prospectively, *id.* at 1256, and does not govern here.

Appellants make several arguments. First, they contend that *Sandstrom v. Montana,* ⸺ U.S. ⸺, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), establishes a constitutional rule against the use of this charge and thus requires us to apply *Chiantese* retroactively. Second, they maintain that a proper objection was made to the charge, rendering the "plain error" rule, Fed.R.Crim.P. 52(b), inapplicable. Last, they argue that even under pre-*Chiantese* law, the prejudicial language of the *Mann* charge was not cured here by additional instructions, since the latter were not given immediately before or after the questioned paragraph.

■ We disapproved of the instruction at issue because it may operate to shift the burden of proof on the issue of criminal intent.[14] In June of this year, the United States Supreme Court declared that a burden-shifting charge intrudes on an accused's due-process right not to be convicted except on proof by the government beyond a reasonable doubt of every element of the crime charged. *Sandstrom v. Montana, supra.*

The charge used in *Sandstrom,* however, is distinguishable from that in the case before us. At issue in *Sandstrom* was whether defendant purposefully or knowingly killed another; the charge read: "*the law presumes* that a person intends the ordinary consequences of his voluntary acts." 99 S.Ct. at 2453 (emphasis added). Here the court merely informed the jury that they *might* infer intent from knowing acts; this is clearly correct. See the recommended instruction in *Chiantese,* 560 F.2d at 1255. The only phrase used here that was prohibited by *Chiantese* involves "unless the con-

---

13. When the trial judge declines to question jurors upon the replacement of one of their number with an alternate, defense counsel may always poll the jury after the verdict. *United States v. Brown, supra* at 990 & n. 10. The trial judge, after the jury was polled and before it was dismissed, asked if counsel or the parties wished the court to undertake any further in-quiry. From the silent record, we presume a negative answer.

14. "When the words, 'so unless the contrary appears from the evidence' were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent." *Mann, supra* at 409 (quoted in *Chiantese, supra* at 1246).

trary appears from the evidence," and such a phrase was neither used nor discussed in *Sandstrom*. Thus, *Sandstrom* does not mandate a finding that the charge at issue is unconstitutional.

Even were we to assume that *Sandstrom* found constitutional deficiencies in all burden-shifting charges, we still would hesitate to, in effect, apply *Chiantese* retroactively. The criteria to be used in deciding whether to apply retrospectively a new constitutional rule of criminal procedure are spelled out in *Adams v. Illinois*, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972). Decisions defining fundamental rights often are given only prospective application; for example, the rule that requires the states to provide jury trials in serious criminal cases was not given retroactive effect, *see De Stefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968); nor was the decision that established the right to counsel at a lineup, *see Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

This court, sitting en banc, made the explicit decision *not* to apply *Chiantese* retroactively, even in the case then under scrutiny. In so doing, the en banc court weighed carefully the wisdom of retroactive application, including the effect of such on the orderly administration of justice, before deciding that the standards announced in *Chiantese* would take effect 90 days after the opinion's date. 560 F.2d at 1255. We see nothing in *Sandstrom* that requires us to abrogate that clear holding.[15]

Before we proceed with our application of pre-*Chiantese* law, we must dispose of defendants' contention that the plain error rule is inapplicable. All briefs for appellants concede that no objection was made to the *Mann* charge. However, counsel at oral argument reversed position and argued that an objection was made.

---

**15.** We note that the Court in *Sandstrom* found that "the law presumes" charges might denote a conclusive or persuasion-shifting presumption, and a jury hearing such a charge might believe that they were directed to find against the defendant or that the defendant must negate criminal intent. —— U.S. at —— ——, 99 S.Ct. at 2455–60, 61 L.Ed.2d at 45–51. The Court further held that these potential interpretations were not "cured" by other instructions on the presumption of the defendant's innocence and on the state's burden of proof. The Court reasoned that because a conclusive or burden-shifting presumption could be viewed as "a means by which proof beyond a reasonable doubt as to intent could be satisfied," the presumption was "not rhetorically inconsistent" with the more general instructions. *Id.* at ——, 99 S.Ct. at 2456 n.7, 61 L.Ed.2d at 47 n.7. Thus, we might infer that *Sandstrom* in effect requires the prophylactic rule we laid down in *Chiantese*: that other instructions on the proper burden of proof will be disregarded if a *Mann* charge is given. 560 F.2d at 1255. If this inference is correct, several of our previous decisions, under which we decide this case, would not pass constitutional muster under *Sandstrom*. *See, e. g., United States v. Chiantese*, 582 F.2d 974 (5th Cir. 1978) (panel decision on remand from en banc consideration); *United States v. Duke*, 527 F.2d 386 (5th Cir. 1976). Or we might adopt a contrary inference, that "other instructions" that *are* "rhetorically inconsistent with a conclusive or burden-shifting presumption" can serve to cure it. *Sandstrom, supra* at ——, 99 S.Ct. at 2456 n.7, 61 L.Ed.2d at 47 n.7. The hair-splitting, case-by-case analysis that this would entail merely serves to emphasize the wisdom of *Chiantese's* prophylactic rule.

But where, as here, the presumption at issue is not even arguably conclusive, we decline to find that the *Chiantese* rule is required by the Constitution. Notably, the Court in *Sandstrom* distinguished two lines of cases in which the undesirable effects of presumptions were ameliorated in part by general instructions similar to the ones found here. —— U.S. at ——, 99 S.Ct. at 2457 n.9, 61 L.Ed.2d at 48 n.9. The Court found that one line, culminating in *Ulster County Court v. Allen*, —— U.S. ——, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), did not involve "presumptions of the conclusive or persuasion-shifting variety," *Sandstrom, supra* at 2457 n.9, 61 L.Ed.2d at 48 n.9; the charge in *Allen*, however, placed at least as much of a burden on the defendant as the one at issue here. More significantly, the *Sandstrom* Court held that it was not bound by *Agnew v. United States*, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624 (1897), in which the jury was charged that there was a presumption that required the defendant to prove his lack of intent beyond a reasonable doubt, in part on the ground that the jury was also expressly told that the presumption was not conclusive. Moreover, even if *Sandstrom* did require the *Chiantese* prophylactic rule, we would refuse to apply it retroactively for the reasons we have cited above. Thus, at least the pre-*Chiantese* decisions on curative instructions that involve nonconclusive *Mann*-type charges are controlling in this case.

■ The charge to the jury covers 54 pages of the transcript. Soon after the jury retired, counsel for some of the defendants attempted to object to an instruction that he believed placed the burden of proof on defendants, but he did not point with specificity to the portion of the charge he found objectionable, even when invited to do so by the trial judge.[16] In these circumstances, we cannot hold this nebulous complaint to be a proper objection. It is clear that the court below was more than willing to correct its mistake; it was counsel's duty to single out the erroneous language in order to facilitate its correction. As it was, the judge was left unenlightened; therefore, the plain error rule applies. *See* Fed.R.Crim.P. 52(b).

Under pre-*Chiantese* law, we look to the whole set of instructions to determine whether the *Mann* charge could have misled the jury. Appellants emphasize that *United States v. Schilleci*, 545 F.2d 519 (5th Cir. 1977), found error because the instruction on the government's having the burden of proof did not follow the *Mann* language. We find *Schilleci* not controlling. In the first place, a charge emphasizing the government's burden does follow the *Mann*-type charge in the case at bar.[17] Similar corrective language also appears several times before the erroneous instruction.[18] Moreover, reliance on *Schilleci* is misplaced

because reversal there was not based solely on an erroneous *Mann* charge.

On remand to the original panel, prejudice in the charge at issue in *Chiantese*, which was identical to the language used here, was found to be cured by proper instructions given before, but in close proximity, to the *Mann* charge. *United States v. Chiantese*, 582 F.2d at 976–77. We think the instructions here were at least as adequate as those in *Chiantese*.

■ The *Chiantese* II court also found ample evidence of objective conduct that would support a jury finding of intent despite an erroneous charge, *id.* at 977; we, too, find the evidence of objective conduct sufficient to sustain a guilty verdict despite the *Mann* language. The error made by the trial court is not plain error; thus, we must reject appellants' contentions regarding the court's charge.

## *The Trial Court's Grant, Then Denial, of Motion for New Trial*

The post-verdict maneuvers in this case were protracted and complex. The verdicts came in on August 17, 1974. The trial judge allowed appellants to delay their filing of amplified motions for new trial until the lengthy transcript could be obtained from the court reporter; such motions finally were filed on June 11, 1976. More

16. DEFENSE COUNSEL: The other position of the Court, I got the impression and I'm not sure—the Court at one time said—and I'm not sure—which was that the defendant had something to prove and I think the Court somewhat said to the jury that the defendant had some sort of burden to prove which was a particular position. I don't recall the exact wording.

THE COURT: If you could call my attention to it I would certainly change that. I thought I had said three times or four that the burden—that the defendant has no burden to produce any witnesses or do anything.

DEFENSE COUNSEL: I know. The Court has said that. But there was one place in the charge it indicated if you believe the defendant did this or that, then the defendant must prove it to you. And I thought it was putting the burden on the defendant.

THE COURT: If you will—

DEFENSE COUNSEL:, I don't recall where—

THE COURT: If the statement was made it was inadvertent, but I don't know where it was made, but I would correct it.

DEFENSE COUNSEL: I do not know.

We assume arguendo that this "objection," if properly made, would preserve the error for all defendants.

17. The *Mann* language is at 47 T. 45; the court stated at 47 T. 52:

[T]he burden is upon the Government to prove beyond a reasonable doubt the guilt of each defendant as to each count for which he is on trial before you and you must acquit—that is, find not guilty—each defendant as to each count where you find, if you do so, that the Government has failed to carry that burden of proof.

18. The court properly instructed the jury regarding the burden of proof and the presumption of innocence.

delay followed, during which evidence was heard on, among other things, the eleven-member jury issue. The court, on its own, discovered the first panel decision in *United States v. Chiantese*, 546 F.2d 135 (5th Cir. 1977), and granted appellants' motion for new trial on April 14, 1977, primarily on the eleven-juror issue but also because the first *Chiantese* opinion appeared to require automatic reversal for use of the *Mann* charge. See discussion above. The government filed a motion for reconsideration within seven days, although its brief in support was not forthcoming until May 26, 1977. Appellants contested this motion and complained of the untimely brief to no avail. The government's brief focused on the eleven-juror question and also informed the court that *Chiantese* had been granted rehearing en banc.

On June 8, 1977, the trial court granted the motion for reconsideration and vacated its previous order granting a new trial. After the en banc *Chiantese* decision in October, 560 F.2d 1244 (5th Cir. 1977), the court overruled the motions for new trial. No judgment of conviction had been entered up to this time. Sentences were imposed in February 1978.

Appellants make alternate contentions: either the trial court lacked jurisdiction to impose sentences following its grant of new trial, or the court abused its discretion in vacating the order granting a new trial and deprived appellants of their due process rights to a speedy trial.

Cases are scarce that bear on the first contention, and none are directly apposite.[19] We held, in *United States v. Spinella*, 506 F.2d 426 (5th Cir. 1975), that once a second trial has begun the court has no power to vacate its order granting a new trial and reinstate the conviction obtained in the first trial. The government urges us to accept *Spinella's* broad obverse, that the district court can alter new trial orders and revive convictions until jeopardy attaches in the second trial. Appellants, on the other hand,

point to language in *Spinella* that states, "The order granting the new trial necessarily has the effect of vacating the *judgment of conviction* rendered in the earlier trial," *id.* at 430 (emphasis added); therefore, the trial court lacked power later to reinstate the judgment. *Id.* They ask us to hold that the order granting a new trial here rendered the *jury verdict* null and void, even though a judgment of conviction had never been entered and despite this case's other factual dissimilarities to *Spinella*.

■ We reject appellants' contention, yet we need not go as far as the government urges. Suffice it to say that on these facts the trial court had jurisdiction to reconsider its grant of new trial. The government's motion for reconsideration was timely; while its brief was late under the local rules of the district, the court's failure to insist on compliance with such rules does not deprive it of jurisdiction. See *Schacht v. United States*, 398 U.S. 58, 64, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (untimely filing of petition for certiorari). Compliance is a matter for the court's discretion, which was not abused here. The *Chiantese* issue had not been briefed fully at the time the order granting a new trial was entered; that order did not vacate a judgment of conviction, and we hold that it did not render the jury verdict a nullity.

We find support in our holding from events transpiring after imposition of sentences. Appellant Spiegel petitioned us for mandamus on the ground that the trial court lacked jurisdiction to impose sentence. We denied his petition, *In re Stanley Spiegel*, No. 78–1764 (5th Cir., June 6, 1978) (unpublished), and the Supreme Court denied certiorari. *Spiegel v. Moye*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).

■ Appellants' alternate contention based on abuse of discretion and violation of the right to a speedy trial fares no better. As we state above, the trial court acted within its discretion; the govern-

---

**19.** *See United States v. Smith*, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947), which holds only that the trial court may not grant a new trial after the court of appeals has affirmed a conviction on direct appeal.

ment's motion for reconsideration was granted within sixty days of the grant of new trial, and the grant of the government's motion served to toll the Speedy Trial Act, 18 U.S.C. § 3161(e) (Supp. V 1975).

We find no arguable merit in the other issues raised by appellants. Accordingly, we affirm the convictions below.

AFFIRMED.