Bernard E. KEISER et al.,
Plaintiffs-Appellants,

v.

COLISEUM PROPERTIES, INC., et al.,
Defendants-Appellees.

A. Don FLECK, Plaintiff-Appellant,

v.

AUDITING SERVICES, INC., et al.,
Defendants-Appellees.

H. G. LORTSCHER et al.,
Plaintiffs-Appellants,

v.

AUDITING SERVICES, INC., et al.,
Defendants-Appellees.

No. 77–3417.

United States Court of Appeals,
Fifth Circuit.

March 24, 1980.

Richard C. Freeman, III, Harold D. Corlew, Atlanta, Ga., for plaintiffs-appellants.

Paul Y. Hughes, pro se.

Before TUTTLE, FAY and THOMAS A. CLARK, Circuit Judges.

FAY, Circuit Judge:

The sole issue before us is whether the district court erred in granting defendant Paul Y. Hughes' motions for summary judgment in three consolidated cases. Reviewing the records in the three cases, we find several genuine issues of material fact which should have been submitted to a jury. We therefore reverse the entry of summary judgment in each case and remand all three cases to the district court for trial on the merits.

I. The Facts

The plaintiffs in these three actions[1] purchased utility auditing franchises from defendant Auditing Services, Inc. (ASI), a wholly-owned subsidiary of defendant Coliseum Properties, Inc. (CPI). ASI offered computerized audits of utility expenses to

---

1. Civil Action No. 17713 was filed by plaintiffs Bernard E. Keiser, Robert C. Morgan, Robert S. Champion, James C. Norris, Edward VanDervelde, Bruce K. Minor, V. Wesley McGaha, R. Clinton Hughes, Jr. and William J. Pringle. Civil Action No. 19605 was filed by plaintiff A. Don Fleck. Civil Action No. 74–2262A was filed by plaintiffs H. G. Lortscher, Roger O'Hanlon, J. Reed Stovall, Jr., and John R. Weaver, Jr. All but two of the aforementioned plaintiffs—McGaha and Hughes—are appellants in this appeal.

businesses and industries. It sold franchises allowing solicitation of customer accounts in defined territories. Prospective franchisees, including the plaintiffs, were told that utility rates from each franchise territory were programmed into the computer, and that auditing by computer was the major advantage offered by ASI. Businesses audited by ASI were to pay fifty percent of any refunds or utility savings to the franchisee, who then was to share half his profits with ASI.

To aid its franchise sales, ASI used photographs of computer facilities depicting an RCA computer and, later, tours of another facility. Prospective franchisees were furnished with the names and addresses of purportedly successful dealers, including paid "singers" who posed as franchisees and deceived prospective franchise purchasers by representing that they received significant income from their "franchises." ASI received over $650,000 as its share of the fees from sixty-two franchise sales in 1971. Franchisees submitted many auditing contracts, but few recoveries resulted, although ASI had represented that the recovery rate would be very high.

Some of the truth about ASI was revealed in the course of the criminal prosecution of Stanley Spiegel and Allan Holloway. *See United States v. Spiegel*, 604 F.2d 961 (5th Cir. 1979). Spiegel owned the controlling interest in Coliseum Properties (CPI) and participated in the formation of CPI's subsidiary, ASI. Holloway, through his own corporation, Holloway Enterprises, Inc. (HEI), contracted with CPI to sell franchises for ASI and another CPI subsidiary.[2] Both Spiegel and Holloway misrepresented the state of ASI's computer capability. A computer expert told Spiegel in April, 1971 that the rate structure of an entire utility company could not be programmed; analysis had to proceed one business at a time. When advised of this and when told such information would ruin ASI's sales pitch, Spiegel indicated that ASI franchisees need not receive this information. Franchise sales continued despite recommendations that such sales be stopped because of a backlog at the computer. Spiegel further misrepresented to at least one franchisee that ASI had leased three-fourths of the time available on an RCA computer at an annual cost of $500,000.[3]

Spiegel and Holloway were each convicted of numerous counts of mail fraud; their convictions were affirmed in *United States v. Spiegel*, 604 F.2d 961 (5th Cir. 1979). The three civil actions out of which this appeal arises were instituted either prior to or during the pendency of the criminal prosecution.[4] Although the three civil cases were commenced at different times, the claims are essentially the same.

The amended complaints in the three cases assert that plaintiffs purchased certain franchises from defendant ASI based upon the fraudulent misrepresentations of various agents of the corporate defendants CPI, ASI, and their affiliates. The individual defendants in the cases—directors, officers, and agents of the corporate defend-

---

2. Leasing Corporation of America (LCA), the CPI subsidiary formed by Spiegel and Holloway, is a defendant in the three actions filed by the plaintiffs; however, it is not a party in this appeal.

3. We take this footnote to express our indebtedness to our brother Judge Gee for his lucid exposition of the facts in *United States v. Spiegel*, 604 F.2d 961 (5th Cir. 1979). In that case the three defendants submitted lengthy briefs raising a total of forty issues on appeal. The transcript of the trial court proceedings filled over fifty volumes. The court noted that "this is a complex case. Any summary of facts will be less revealing than an iceberg's proverbial tip." *Id.* at 962. Notwithstanding that dis-

claimer, we have relied on the facts set out in *Spiegel* to provide background to the related case before us.

4. The indictment in *United States v. Spiegel* was issued on January 23, 1973. Prior to that date, Civil Action No. 17713 (the *Keiser* case) was filed May 24, 1972, in the U. S. District Court for the District of Kansas. The *Keiser* case was transferred to the Northern District of Georgia on January 22, 1973. Civil Action No. 19605 (the *Fleck* case) was filed in the U. S. District Court, Northern District of Georgia, on December 21, 1973. Civil Action No. 74–2262A (the *Lortscher* case) was filed in the same court on November 20, 1974.

ants [5]—are accused of conspiring to fraudulently represent to the plaintiffs that ASI was a national organization with an established ongoing marketing system and a unique and proven method for auditing utility charges. The defendants allegedly misrepresented that:

(1) ASI had services and materials available to dealers, including a planned, pre-programmed and fully operational computer facility applicable to the offered program;

(2) the ASI computer was being moved;

(3) reorganization was in progress;

(4) a new series of plans was being developed;

(5) a refund program was in progress; and

(6) a resale program and/or a transfer program was in progress.

Record, vol. I, at 125–141.

Plaintiffs further claim that the defendants, including defendant-appellee Hughes, commingled, manipulated and secreted the assets and liabilities of the corporate entities in order to defraud defendants' creditors, including the plaintiffs. The defendants allegedly were aware of the fraudulent scheme and either participated in it or ratified it by their activities. Plaintiffs assert that the defendants covered up the scheme to prevent plaintiffs from abandoning their respective franchises. Because the defendants misled plaintiffs into believing that the corporations and organizations involved were being restructured and refinanced, the plaintiffs attempted to maintain their franchise contacts with businesses, consequently suffering substantial monetary losses as well as injury to their personal and business reputations.

## II. The Procedural Path To The Fifth Circuit

The *Keiser, Fleck* and *Lortscher* actions were filed in 1972, 1973, and 1974 respectively. The *Keiser* and *Fleck* cases were consolidated in May, 1974; in February, 1975 all three cases were consolidated as the *Coliseum Properties Cases.* Record, vol. III, at 106. The docket sheets in the record indicate that some discovery took place in early 1974; that an order staying the proceedings against defendant CPI was filed in October, 1974; and that in December, 1974 the plaintiffs were directed to file a brief regarding the bankruptcy proceedings of several of the defendants (including CPI) and the need for a stay order. The three plaintiffs filed a memorandum asserting that there should be only one jury trial on the issue of fraud, and that the defendants should not be permitted to have a separate trial of that issue before the bankruptcy court. Record, vol. I, at 57–69.[6] In March, 1975 the court issued an order stating its intention that the *Coliseum Properties Cases* be tried on all issues as to all parties, "despite the fact that some of the parties herein may be in the process of bankruptcy adjudications. . . . Previous stays as to any parties for such reason shall be dissolved." Record, vol. I, at 145.

Discovery in the three consolidated cases continued from December, 1974 through February, 1977. During this period the criminal defendants in *United States v. Spiegel* were tried and convicted, and their motions for new trial were denied.[7]

On April 27, 1977, defendant-appellee Paul Y. Hughes submitted a motion for summary judgment in the *Fleck* and *Lortscher* cases, along with a statement of

---

**5.** Among the individual officers and agents named as defendants in the three civil cases are Stanley Spiegel and Allan Holloway, the defendants in the related criminal prosecution, and Paul Y. Hughes, the sole appellee in the case before us.

**6.** Because our record of the district court proceedings is incomplete, we are uncertain whether the stay orders referred to in the docket sheet, Record, vol. I, at 7, and in plaintiffs'

brief, Brief for Appellants at 2, were intended to stay the bankruptcy proceedings or the proceedings in the instant cases. Any stays granted were subsequently dissolved by the court's order of March 27, 1975. Record, vol. I, at 145.

**7.** On May 3, 1974 the court had indicated that the consolidated civil cases would probably not be set for trial until the completion of the criminal trial. Record, vol. I, at 7.

"undisputed material facts," a brief, and an affidavit. Record, vol. II, at 78–88; vol. III, at 162–172. Although the *Fleck* and *Lortscher* actions had previously been consolidated with the *Keiser* case, no motion for summary judgment against Keiser was filed at this time. At a pretrial conference on May 6, 1977 the court directed the plaintiffs in the *Fleck* and *Lortscher* cases to respond to the motion for summary judgment within ten days. In response to a request for additional time, the court noted that

> where you have got a pro se motion in a case that's as complicated as this, that it is going to be one of those that all you have to point out is that there are complicated facts with respect to the matter and, therefore—it is not a case for summary judgment. It is hard for me to see, in a case that's been going for seven years on a case with jurisdictional matters, how you are going to have any real basis for a substantive summary judgment.

Record, vol. IV, at 27.

Plaintiffs Fleck and Lortscher submitted their responses to the motion for summary judgment on May 10, 1977. The motion was granted by the court on June 9, 1977; plaintiffs subsequently submitted motions for reconsideration. On June 30, 1977 defendant Hughes filed a response to the Fleck and Lortscher motions for reconsideration. That same day he also filed a motion for summary judgment in the *Keiser* case, having inadvertently omitted the *Keiser* action from the caption of his April 27 motion for summary judgment. After further supplementation of the motions and responses by all parties, the court, on August 26, 1977, entered an order denying the Fleck and Lortscher motions to reconsider and granting Hughes' motion for summary judgment in the *Keiser* case. Record, vol. I, at 313. Thereafter, final judgment was entered in favor of defendant Hughes, the court not-

ing that "the claim against Hughes has been adjudicated by the granting of summary judgment which was based on the finding that Hughes formed no part of the conspiracy of which plaintiff[s] complain." Record, vol. I, at 327. Plaintiffs appeal the grant of Hughes' motion for summary judgment. We reverse.

### III. The Law of Summary Judgments

Under Rule 56 a motion for summary judgment shall be granted forthwith "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). While summary judgment is a proper device for adjudicating claims, it is "a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967).

■■■ The federal rule clearly indicates that a summary judgment is appropriate only if no genuine issue of material fact exists. The burden of proof falls on the party seeking summary judgment, and any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.*, 606 F.2d 602 (5th Cir. 1979); *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824 (5th Cir. 1978). We note that a court can only enter a summary judgment if *everything* in the record—pleadings, depositions, interrogatories, affidavits, etc.—demonstrates that no genuine issue of material fact exists. Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention—the court must consider both before granting a summary judgment.[8] *See Higgenbotham v. Ochsner*

---

8. We place special emphasis on this point in light of certain of the court's comments at the pretrial conference. Referring to a motion to dismiss a party for lack of jurisdiction, the court said:

> I'm not going to go through a bunch of depositions to try to find out what the situation is. I'm going to decide it on the papers relating to the motion.

*Foundation Hospital*, 607 F.2d 653, 656 (5th Cir. 1979). With the stringent criteria for summary judgment in mind, we search the record before us for genuine issues of material fact.

## IV. Genuine Issues of Material Fact as to Paul Y. Hughes

Plaintiffs allege that defendant Hughes, along with the other defendants in the case, fraudulently led plaintiffs to believe that ASI had a working computer operation at a time when he knew that no such computer existed. Plaintiffs have presented numerous documents and substantial testimony to support their allegations. Defendant Hughes' responses to the evidence presented by the plaintiffs raise several genuine issues of material facts.

### A. Genuine Issue No. 1

■ Plaintiffs claim that the liability of defendant Hughes arises from his activity between April and November, 1971. During that period, it is asserted, Hughes was in charge of the operations of ASI, and he was the main contact between ASI and its franchisees. Record, vol. II, at 163. Because of Hughes' efforts, the franchisees continued to believe in the existence and utility of ASI's computer program, and they claim that Hughes was largely responsible for their continuing devotion of time, effort, and money to their ASI franchises. Plaintiffs cite to several letters, depositions and affidavits which illustrate Hughes' active involvement with the franchisees and his role in the fraudulent ASI scheme. *See, e. g.*, Record, vol. I, at 200–249.

Hughes vehemently denies playing any major role in the ASI hierarchy. His Answer to Motion for Reconsideration sets forth a statement of undisputed material facts not challenged by plaintiffs. The "undisputed material facts" are that Hughes never engaged in the sale or marketing of franchises; that he had no authority to set policy or to commit the company to any course of action; and that his activities were limited to specific internal responsibilities. Record, vol. II, at 174.

Hughes is correct in his statement that these facts are material, but to say they are undisputed is to ignore the voluminous file in this case. The record is replete with numerous references to Hughes' takeover of ASI in June, 1971, and there is deposition and documentary evidence that he worked in an unsupervised capacity, contacting and corresponding with various ASI franchisees. Record, vol. I, at 219. Clearly, the allegations in the case make Hughes' participation in ASI a material issue of fact, and there is no question that the parties vigorously dispute the nature of that participation. Such a dispute is not properly resolved on a motion for summary judgment.

### B. Genuine Issue No. 2

■ Plaintiffs rely on the deposition of Hughes' co-defendant Edward T. Carroll to show that Hughes knew during the summer of 1971 that there was no working computer at ASI. Carroll testified that he and Hughes had discussed the absence of a computer numerous times, and that Hughes "knew there was no computer because we went to a manual operation." Deposition of Edward T. Carroll at 74–76. Plaintiffs also refer to Hughes' sworn testimony in the *Spiegel* criminal prosecution. There Hughes testified that during the period from May through August, 1971 his function was to find people to help out with the manual utility auditing operation "since the computer thing had apparently bogged down." Record, vol. 39, at 191, *United States v. Spiegel*, 604 F.2d 961 (5th Cir. 1979).

Having presented testimony that Hughes knew by mid-summer of 1971 that no work-

Record, vol. IV, at 15–16. Responding to the plaintiffs' request for an extension of time to answer the motion for summary judgment, the court said:

Well, the best answer to that is don't make them lengthy. Generally, I am decided by just the core paragraph in most briefs, and if you could just put it on one page, generally, that's all you need to do. Just put your best cases or best arguments on it.

*Id.* at 26.

ing ASI computer existed, plaintiffs then show how Hughes led plaintiffs to believe the contrary. The affidavit of plaintiff Keiser states that

during the summer of 1971 and through the fall of 1971, particularly September through late October and November, 1971, Affiant had a number of telephone conversations with Defendant PAUL Y. HUGHES. During the course of those conversations, PAUL Y. HUGHES related that the auditing analysis program was not going as well as expected for there were problems *with the computer and its program.*

Record, vol. I, at 297 (emphasis added). The plaintiffs also point to certain letters and news bulletins sent to them by Hughes which make reference to "your printouts," "telephone printouts," and mailings that "were jumbled by the computer." Record, vol. I, at 200–205.

Defendant Hughes, in his Answer to Motion for Reconsideration, Record, vol. I, at 250, attempts to rebut the evidence presented by plaintiffs by explaining that the use of the words "printouts" and "computer" in his correspondence did not refer to a utility auditing computer. While Hughes' rebuttal of the plaintiffs' evidence may appear persuasive, the weighing or evaluating of evidence is not our task, nor that of the trial judge, on a motion for summary judgment. Clearly the documents and testimony presented by the parties reveal a genuine jury issue as to whether Hughes fraudulently represented to the plaintiffs that ASI had a working computer operation at a time when he knew that no computer actually existed.

### C. Genuine Issue No. 3

■ Plaintiffs allege that their reliance on the false and fraudulent representations of defendant Hughes caused them to suffer monetary damages. The affidavit of plaintiff Fleck attests to his reliance on Hughes' statements of August 16, 1971 that a computer program existed and was operating. On that day, Fleck had lunch with Hughes and another ASI employee in Atlanta.

During a long discussion of the relative merits of the computer method of analyzing overcharges, Hughes indicated that there was a computer, that the computer and the computer program were operating, and that the computer was checking all accounts sent in by ASI dealers for overcharges. Hughes also discussed a new ASI computer program and the affirmative effect it would have upon ASI's utility auditing services. He stated that the new computer program was much better than the prior one, and would be able to accomplish more utility audits at a greater speed than previously possible. Plaintiff Fleck's affidavit states

that following the luncheon meeting with Defendant PAUL Y. HUGHES, and based upon the statements and representations of Defendant PAUL Y. HUGHES and his strict reliance thereon, Affiant went to ASI's office and made a downpayment on a second ASI dealership. Affiant states that he paid a fee of $5,000.00 by certified check on the afternoon of August 16, 1971, for this second dealership. . . .

Affiant reiterates that the payment of $5,000.00 on August 16, 1971 . . . was paid by Affiant in reliance upon the representations and statements of Defendant PAUL Y. HUGHES relative to the new computer program then being utilized by ASI. If Affiant had known that there was no computer or computer program, Affiant would not have made a further investment.

Record, vol. I, at 302.

Defendant Hughes counters the reliance claim by asserting that Fleck came to Atlanta to pay his deposit on a franchise which had been sold to him previously. Since Fleck had already purchased the franchise, he obviously did not rely on any subsequent statements by the defendant. To further dispel the plaintiffs' reliance argument, Hughes pointed out in oral argument that the check which Fleck brought to Atlanta was dated three days prior to the August 16, 1971 meeting date. Plaintiffs responded that although Fleck was interest-

ed in buying a franchise at that time and brought a check to the Atlanta meeting, he did not decide to purchase a franchise until he had heard the representations by Hughes. This series of assertions and responses by the respective parties indicates that a genuine issue exists as to whether the plaintiffs actually relied on the alleged misrepresentations of Paul Y. Hughes. Such an issue ought not be decided by summary judgment.

V. Conclusion

The genuine issues of material fact set forth in this opinion are just three examples of the numerous conflicts running through the voluminous records in this complex civil case. The trial judge was correct when he stated that "there are complicated facts with respect to the matter and, therefore—it is not a case for summary judgment." Record, vol. IV, at 27. Summary judgment is apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions. *Kubic v. Goldfield*, 479 F.2d 472 (3d Cir. 1973).

Recognizing the expense involved in litigation and the need for full utilization of summary proceedings to protect innocent litigants, we find the use of such summary proceedings to be both inappropriate and incorrect in this instance. The district court improperly reviewed, interpreted, and weighed evidence which should have been submitted to a jury. Because we find that these cases raise many genuine issues of material fact, we reverse the entries of summary judgment and remand for trial on the merits.

REVERSED AND REMANDED.