Colin **CLARK**

v.

**LOUISIANA STATE PENITENTIARY,
et al.**

Civ. A. No. 81–262–A.

United States District Court,
M. D. Louisiana.

Aug. 26, 1981.

---

Richard Shapiro, New Orleans, La., for petitioner.

Kay Kirkpatrick, Asst. Dist. Atty., Baton Rouge, La., for respondents.

JOHN V. PARKER, Chief Judge.

This is a petition for habeas corpus relief brought under the provisions of 28 U.S.C. § 2254. Petitioner attacks his state conviction of murder and sentence to death upon federal constitutional grounds. Essentially, petitioner's claims are: (1) that he was denied due process of law in violation of the Fourteenth Amendment by reason of a jury instruction on criminal conspiracy which relieved the state of proving specific intent to kill beyond a reasonable doubt, and (2) that he did not receive a fair trial by reason of ineffective assistance of his court appointed counsel in violation of his rights under the Sixth and Fourteenth Amendments.

The facts as found by the Supreme Court of Louisiana in its review of petitioner's conviction and sentence are:

"On Saturday, July 15, 1978, at 1:59 a.m., a burglar alarm was set off at the Red Lobster Inn in Baton Rouge, Louisiana. Police arrived at the Inn at 2:05 a.m. and upon entering found the body of Fred Schmidt, the assistant manager of the restaurant. Schmidt had been stabbed approximately thirty to thirty-five times and had been shot once. A pathologist testified that the knife wounds were delivered before the shooting, which produced instant death. Two of the knife wounds would otherwise have been fatal. Found next to the body was a butcher knife that according to the pathologist could have been the knife used. A ballistics expert testified that the bullet was fired from a .38 caliber revolver. Also found at the scene were spots of blood of the same type as that of defendant, two band-aid wrappers and an entry in that manager's log reading "Colin walked out, S.O.B." A metal strongbox, approximately $1,800.00 and two bottles of Chivas Regal Scotch were missing.

Defendant had been employed as a waiter at the Red Lobster and had quit earlier that evening. A waitress at the restaurant testified that defendant and the victim had an argument that evening. Three witnesses testified they saw defendant's car at the restaurant or several blocks away driving toward the restaurant immediately prior to the crime. Two of these witnesses also testified they saw two persons in the car. One witness testified a friend with her shouted, "Hey, Colin," when the car passed and the passenger in the car stuck his arm out of the window and waved.

Two of the defendant's roommates, Linda Pittman and Rod Reid, testified they were in bed in their room at 4:00 or 4:30 a. m. when defendant and their other roommate, Michael Glover, returned home. Defendant shut the door to Pittman and Reid's room, telling them he had a couple of lady friends with him. When they heard unusual shuffling noises, Pittman and Reid left their room to investigate. Defendant and Glover were packing their belongings. Defendant's hand was badly cut and, according to Pittman, had band-aids on it. Pittman noticed an unusually large number of bills in Glover's wallet. At about 5:30 a. m., after consuming a bottle of Chivas Regal scotch they had brought with them, defendant and Glover departed, telling Pittman and Reid that if anyone asked, they should say defendant and Glover left for San Francisco, California, two days before. After they left, Pittman and Reid noticed that a metal strongbox they had

seen during the packing was gone. Furthermore, Pittman and Reid both testified defendant owned a knife like that found at the scene of the crime and Glover owned a .38 caliber revolver, the same type of gun as used in the murder. Glover was arrested in New York City; defendant was arrested in San Diego, California; his car was found in Tallahassee, Florida." *State v. Clark*, 387 So.2d 1124, 1127 (La.1980)

The Supreme Court of Louisiana affirmed petitioner's conviction and sentence and the Supreme Court of the United States denied his petition for certiorari. 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), and his petition for re-hearing, 449 U.S. 989, 101 S.Ct. 1530, 67 L.Ed.2d 825 (1981). Thereafter, in accordance with Louisiana procedure, the presiding judge signed a warrant of execution fixing April 8, 1981, as the date to carry out the death sentence. Petitioner then applied for post-conviction relief in state court, which was denied by the Nineteenth Judicial District Court for the Parish of East Baton Rouge, on April 3, 1981, and by the Supreme Court of Louisiana on that same date.

Having thus exhausted state court remedies, petitioner initiated this action on April 5, 1981, and following an abbreviated hearing on April 6, 1981, this Court granted a stay of execution pending a full hearing on petitioner's claims. A full hearing was conducted on April 23, 1981, at which petitioner was present and testified. Thereafter, post-trial briefs were submitted by both sides and the matter was submitted to the Court on May 23, 1981. Thereafter, petitioner moved to reopen the proceedings for an expansion of the record. On June 19, 1981, the Court heard oral argument on that motion and permitted the plaintiff to make the unsworn statements of Donna Bonaventure and Mrs. Sidney Mack, Jr., a part of the record, together with his own affidavit. The state was allowed to file a certified copy of the transcript of the testimony of Donna Bonaventure at the trial of Michael Glover, Clark's co-defendant, who was tried separately, and the matter was re-submitted on additional briefs on June 26, 1981.

I.

Petitioner has been represented throughout these proceedings by Richard E. Shapiro, Esq., who prepared the pleadings, filed them, appeared in court, interrogated witnesses, made oral argument, and prepared and filed several briefs on petitioner's behalf. As a result of two handwritten communications, apparently from the petitioner, stating that he had discharged Mr. Shapiro and desired to dismiss his application for habeas corpus relief, the Court conducted another hearing on July 31, 1981. Petitioner was present at that hearing. He confirmed that the handwritten communications to the Court were authentic and that he desired to discharge Mr. Shapiro as his counsel. He further stated that he still desired to dismiss this application for habeas corpus. The Court permitted petitioner to discharge counsel but denied his request to dismiss the action.

█ This action has been completely tried, fully briefed and submitted to the Court for decision. Under Rule 41(a)(2) FRCP, the Court has discretion to decline to authorize voluntary dismissal. Here, if petitioner were allowed to dismiss, he could change his mind next week and present a new application raising the same issues, which would require additional hearings. *Potts v. Zant*, 638 F.2d 727 (5th Cir. 1981). Where an action of such magnitude, involving the life of the applicant, has been fully litigated and submitted for decision with the assistance of counsel, this Court deems it inappropriate to permit voluntary dismissal. Thus, although petitioner may certainly discharge his counsel, the Court will not permit dismissal of the action and will proceed to render its decision on the merits.

II.

Initially, petitioner claimed that his court-appointed, "lead" counsel, J. J. McKenzie, Esq., was so beset by marital problems and consumption of alcoholic beverages during the trial, that he neglected

the case and committed numerous trial blunders which deprived petitioner of his Sixth Amendment right to effective assistance of counsel. Because there had been no evidentiary hearing on this issue in state court, this Court held a hearing on April 6, 1981, directed to that issue. *Clark v. Blackburn*, 619 F.2d 431 (5th Cir. 1980).

Mr. McKenzie testified that at about the time of petitioner's trial, he did indeed have marital problems and that during this period, out of court, he did consume significant quantities of alcoholic beverages. He denied that his judgment, actions or trial decisions were impaired by reason of these factors. Court appointed co-counsel, R. Neal Wilkinson, Esq., testified that he was with Mr. McKenzie all day every day during the trial and frequently before and after trial, that they conferred constantly about trial decisions and that he never detected any indication that Mr. McKenzie was under the influence of alcoholic beverages. The assistant district attorney who prosecuted the case and the experienced trial judge who presided at the trial confirmed Mr. Wilkinson's observations.

Petitioner has not referred to this claim in any subsequent brief filed after the conclusion of the April 6th hearing and we assume that that claim is abandoned. In any event, this Court finds that there is no evidentiary basis for the claim of ineffective assistance of counsel by reason of consumption of alcoholic beverages by Mr. McKenzie or on account of distraction due to other problems.

### III.

As can be seen from the facts quoted above, the case against petitioner was entirely circumstantial. Clark was convicted of first degree murder under LSA–R.S. 14:30 which, at the time of trial, required proof by the state (1) of the killing of a human being, (2) that defendant had the specific intent to kill or to inflict great bodily harm, and (3) that the killing occurred while the defendant was engaged in the perpetration or attempted perpetration of armed robbery.

Petition vigorously argues that the trial judge committed error by charging the jury on the elements of criminal conspiracy and the liability of members of the conspiracy for acts undertaken by co-conspirators. Petitioner argues that the charge unconstitutionally relieved the state of its burden of proving beyond a reasonable doubt that Clark personally participated in the killing and that he possessed the necessary specific intent. The contested instruction reads as follows:

"Criminal conspiracy is defined in our code as the agreement or combination of two or more persons for the specific purpose of committing any crime. Providing that agreement or combination to commit a crime shall not amount to a criminal conspiracy unless in addition to such an agreement or combination one or more of such parties does an act in furtherance of the object of the agreement or combination. If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense. Each conspirator in a conspiracy is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby. Or whether the conspirator doing such an act or making such declaration be or be not on trial with his co-defendant." Tr. 606–607.

Clark's attorneys objected to the charge at trial and renewed that objection on appeal. The Supreme Court of Louisiana held that the state had proved a prima facie case of conspiracy and that the charge was proper under Louisiana law. That court did not consider the issue presented here as to whether the charge violates the Fourteenth Amendment rights of petitioner by permitting the state to avoid proving all of the elements of the offense beyond a reasonable doubt.

█ Initially, we note that federal courts do not sit as reviewing tribunals of state

court convictions. A federal court has only the limited jurisdiction bestowed upon it by the Congress under 28 U.S.C. § 2254. A federal district court may entertain an application for a writ of habeas corpus by a person in state custody, "only on the ground that he is in custody in violation of the Constitution or, laws or treaties of the United States." Thus, this Court has no jurisdiction to retry petitioner or even to review the trial record for errors, unless those errors amount to violations of the federal constitution.

■ The Supreme Court has made it plain that no federal court may over turn a state conviction on the ground of erroneous instructions unless it "be established not merely that the instruction is undesirable, erroneous or even 'universally condemned', but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). An applicant for federal habeas corpus may sustain a collateral attack upon an erroneous state jury instruction only by demonstrating that the instruction by itself so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

In *Cupp v. Naughten*, supra, the Supreme Court further stated:

"In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see *Cool v. United States*, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and in-

struction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is one of several components of the trial which may result in the judgment of conviction." 94 S.Ct. (at 400).

There can certainly be no dispute that the Constitution requires that a state prove beyond a reasonable doubt every fact necessary to constitute the crime alleged. *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970). Petitioner argues that, specific intent to kill being an essential element of the crime of first degree murder under Louisiana law, the jury must make a finding of his personal intent in order to satisfy the demands of *Winship*, supra, and that the conspiracy instruction given by the Court permitted the state to impute specific intent to Clark. Petitioner argues that under the terms of the instruction, it was necessary that the jury find that Clark was present at the scene of the crime or if he was present that he possessed the specific intent to kill. He argues that the instruction was so confusing that the jury could have convicted Clark without ever finding that he possessed the specific intent to kill the victim, Fred Schmidt.

■ As required by *Cupp v. Naughten*, it is necessary that we review the entire context of the trial court's instruction to the jury. In addition to the conspiracy charge complained of and excluding the general instructions given in every criminal trial such as the effect of the indictment, the duty to deliberate, the veracity of witnesses, and so on, we note that the trial judge here specifically instructed the jury relative to the presumption of innocence of the accused, that the state has the burden of proving each and every essential element beyond a reasonable doubt, that the Court defined reasonable doubt, that the Court instructed as to the effect of flight by the defendant, the Court instructed in the law of principals, direct and circumstantial evidence, the elements of first degree murder, the penalty for first degree murder, responsive verdicts to the offense charged, the

definition of criminal intent, that the jury may presume that the defendant intended the natural and probable consequences of his acts, a summary of possible verdicts. Upon the request of the jury, the Court repeated its charge on reasonable doubt, the charge on direct and circumstantial evidence, its charge on responsive verdicts, and its general closing charge.

In instructing the jury on the offense charged, the Court said:

"The defendant in this case is charged with first—with the first degree murder of Fred Schmidt. First degree murder is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm while engaged in the perpetration or attempted perpetration of an armed robbery. Armed robbery is defined as a theft of anything of value from the person of another or which is in the immediate control of another by use of force or intimidation while armed with a dangerous weapon. Theft is the taking of anything of value which belongs to another with a specific intent to deprive the other permanently of the thing taken. Anything of value must be given its broadest possible construction including any conceivable thing of the slightest value. A dangerous weapon includes any instrumentality which in the manner used is calculated as likely to cause death or great bodily harm. Thus, in order to convict this defendant of first degree murder you must find that the defendant killed or was a principal in the killing of Fred Schmidt. *And that the defendant had specific intent to kill or inflict great bodily harm.* And that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery." Tr. 608

In setting forth the verdicts which were responsive to the charge, the Court defined the offense of second degree murder and stated:

"The difference between murder in the first degree and murder in the second degree in this respect is that in murder one *you must find a specific intent to kill,*

whereas in murder two no intent is required." Tr. 609.

The Court further defined criminal intent:

"Criminal intent may be specified or general. Specific criminal intent is defined as follows; that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or his failure to act. General criminal intent is present when circumstances indicate that the defendant must have averted to the prescribed criminal consequences as reasonably certain, to result from his act or failure to act. A General criminal intent is always present when there is a specific intent and whether specific intent is present must be determined in light of ordinary experience. Intent is a question of fact in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances." Tr. 610–611.

As noted above, after the jury had retired, the trial judge upon the jury's request repeated a portion of its instructions including the definition of murder in the first degree and its summary, "Thus, in order to convict the defendant of first degree murder, you must find that the defendant killed or was a principal in the killing of Fred Schmidt and that the defendant had a specific intent to kill or inflict great bodily harm and that the defendant was engaged in the perpetration or attempted perpetration of armed robbery." Tr. 618 The judge also repeated the definition of second degree murder, including, "The difference between first degree murder and second degree murder, in this respect, is that in first degree murder you must find a specific intent to kill whereas in murder—uh—second degree murder no intent is required." Tr. 618

A review of the trial judge's instructions under the standard required by *Cupp v. Naughten,* supra, clearly indicates that this jury was repeatedly instructed that they could not convict Clark unless they found beyond a reasonable doubt that he pos-

sessed the specific intent to kill or to inflict great bodily harm upon Fred Schmidt. A fair review of the entire charge indicates that it was not confusing and indeed, not erroneous. This Court has carefully reviewed each and every word in the transcript of testimony, the Court's instructions and the argument of counsel, and is convinced that this record demonstrates that the jury concluded that the evidence established beyond a reasonable doubt that Clark possessed the specific intent to kill Fred Schmidt.

Accordingly, petitioner's attack upon the conspiracy jury instruction must fail.

## IV.

Petitioner's claim of ineffective assistance of counsel involves several issues. First, petitioner argues that counsel failed to object to inadmissible hearsay which was highly prejudicial and clearly inadmissible and that counsel failed to conduct adequate investigation and pre-trial preparation so as to be prepared to exclude that testimony or to counter it, if admitted by the presiding judge. Second, Clark argues that counsel should have but did not object to a jury instruction delivered on the subject of the law of principals, or aiding and abetting. Clark argues that this instruction was incorrect under Louisiana law and counsel was ineffective in failing to object to it. Third, petitioner argues that counsel failed to object to another jury charge to the effect that, "you may presume that the defendant intended the natural and probable consequences of his acts," that this instruction is clearly unconstitutional under the Supreme Court's decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450 at page 2453, 61 L.Ed.2d 39 (1979), and that his counsel was unaware of that decision and thus ineffective. Petitioner also claims that counsel should have opposed a motion by the state to obtain a sample of petitioner's blood and that counsel prevented him from testifying in his own defense. Clark argues that these alleged derelictions of court appointed counsel show that the state did not provide him adequate counsel as

required by the Sixth Amendment and he was thereby deprived of a fair trial in violation of the Fourteenth Amendment. We will consider each of these issues.

a) *The Hearsay Issue.*

Debra Richard, a waitress at the Red Lobster Restaurant, testified that when she got off work around midnight on the night of the crime, she and several other waitresses went to a doughnut shop a few blocks west of the Red Lobster on Florida Street. While they were in the parking lot of the doughnut shop at some time between 12:30 a. m. and 1:30 a. m., she saw an automobile which she recognized as that of the defendant, Clark. There were two persons in the car and when Donna Bonaventure, another waitress who was present, loudly yelled, "Hey, Colin," the person on the passenger side in the automobile stuck his arm out the window and waved to them. The car was traveling in an easterly direction, toward the location of the Red Lobster. Richard could not see either occupant of the car clearly enough to identify him. The defense, according to the record, made no objection to this testimony.

The witness who delivered the utterance, "Hey, Colin," Donna Bonaventure, did not testify at Clark's trial. The state offered in evidence a subpoena for her which had been returned, "Moved, unable to locate." During closing argument, the prosecutor referred to Richard's testimony and the defense then objected. The trial judge overruled the objection which was renewed on appeal. The Supreme Court of Louisiana considered the issue and held that since there was no objection at the time the testimony was offered, it was admitted into evidence for all purposes and that it could be commented upon by the prosecution during closing argument. *See State v. Clark*, 387 So.2d 1124, 1131 (La.1980). That court apparently assumed, without discussion that the utterance, "Hey, Colin," was inadmissible hearsay.

Petitioner indicts his court appointed counsel in several respects. In the first place, petitioner argues that the counsel

should have conducted an adequate investigation by interviewing both Richard and Bonaventure and should have excluded the testimony by a motion in limine. If they failed to accomplish that, then petitioner argues that counsel should have had Bonaventure available to testify at the trial and to provide information for cross examination of Richard.

To support this view, petitioner was allowed to expand the record of this proceeding by filing an unsworn statement of Bonaventure, dated May 31, 1981. Generally, this unsworn statement recites that she moved from Baton Rouge to Florida shortly after the crime was committed, that she returned to Baton Rouge to testify at Glover's trial, which preceded that of Clark, that Clark's attorney never contacted her prior to trial, that she could have been contacted through her mother, Mrs. Sidney Mack, Jr., and her stepfather who live in Baton Rouge and that, if contacted she would have been willing to return to Baton Rouge to testify at Clark's trial. She further stated that she went to the doughnut shop with Richard and the other girls from the Red Lobster, that between one and one-thirty a. m. a car that looked like Clark's car passed heading in an easterly direction on Florida Street and that somebody honked the horn of the car. She denied that she or any of the other girls yelled, "Hey, Colin," and that anyone in the car waved. She stated that she could not identify either of the occupants.

Mrs. Mack's unsworn statement was also added to this record and it simply confirms that neither prosecution nor defense attempted to contact Bonaventure through her.

At the hearings before this Court, Mr. McKenzie testified that he interviewed Debra Richard before she testified during the trial, that he tried to interview other witnesses, some of whom refused to talk to him, including the restaurant manager and Clark's roommates. At another point in the testimony, Mr. McKenzie indicated, however, that he was surprised when Richard, "blurted out," the hearsay statement. Mr.

Wilkinson testified that the district attorney's office made its entire file on the case, including police reports, available to defense counsel and that he tried to interview every potential witness that he could locate. He testified that some were very difficult to find, some he could not locate, and that some refused to talk to him. He testified that he interviewed both Richard and Bonaventure as well as other employees of the Red Lobster whose names he could no longer recall. He also testified that when Richard testified regarding the "Hey, Colin," statement, he arose to object but changed his mind because he did not want to emphasize this statement in the presence of the jury.

Both attorneys testified that neither was aware before trial that Bonaventure would not be present, that neither made any attempt to have her present at trial, that they considered her a state witness and that they were pleased by her absence. Neither could see any advantage to their client in having Bonaventure present at the trial.

Petitioner argues that had his attorneys contacted Bonaventure, she could have contradicted Richard's testimony and that counsel failed in their duty to their client in not securing her presence at trial.

Defendant's trial began August 8, 1979, and these attorneys testified nearly two years later, without notes, regarding their activities. The Court is convinced that their recollections are not entirely accurate about which witnesses they interviewed or about what those witnesses told them and that from time to time each confused Richard with Bonaventure. For example, Mr. Wilkinson testified that Bonaventure told him substantially the same story as told by Richard and that neither could identify the occupants of the car. The Court finds that unlikely in view of the response filed by the state to petitioner's motion to expand the record.

The state, in response to that motion, filed a copy of the transcript of the testimony of Bonaventure at Glover's trial and that testimony confirms, to this Court, that whatever the reason, court appointed coun-

sel's decision to make no effort to secure the presence of Bonaventure at Clark's trial was correct. At Glover's trial, Bonaventure testified under oath that as Clark was leaving the Red Lobster on the afternoon of July 15, he told her that he had been fired and that he had had an argument with the victim, Fred Schmidt. She further testified regarding the trip to the doughnut shop and she positively identified the defendant, Clark, as being the passenger in the car that passed although she could not identify the driver. She testified that it was one of the other girls, not her, who yelled, "Hey, Colin," and to that extent her testimony does contradict that of Richard.

This contradiction, however, is inconsequential. It matters not which of the girls in the parking lot yelled, "Hey, Colin"; the significant factor is that it was uttered. The danger to Clark from Bonaventure's testimony is obvious. At Glover's trial, she did not merely identify his automobile, she positively recognized Clark as being in the car within thirty minutes to an hour prior to the commission of the crime and in the vicinity of the scene of the crime. Had she appeared and so testified at Clark's trial, she would have materially helped the state's case. Had she appeared for the defense at Clark's trial and testified in conformity to her unsworn statement, the state would have totally impeached her with her prior testimony which was, of course, inadmissible at Clark's trial except for impeachment purposes.

Clearly, counsel should have made every effort to interview Bonaventure and all other potential witnesses and the record before this Court is somewhat muddled as to whether counsel did so, although Mr. Wilkinson testified that he attempted to locate all the potential witnesses and attempted to talk to all of them. Counsel should have also been aware of Bonaventure's prior testimony at the Glover trial, and perhaps they were but do not now recollect it. In any event, Clark has not shown that counsel's actions regarding the Bonaventure witness hurt his case; on the contrary, Bonaventure's absence hurt the state's case.

The unsworn statement of Bonaventure taken by a private investigator representing Clark, some two years after the trial and three years after the commission of the crime is entitled to little, if any, credence. Memories fade and become unclear and a skilled interviewer, particularly after explaining that his client's life is at stake, can lead a witness into making unsworn statements which contradict not only prior testimony but established facts. This Court has little doubt that if Bonaventure were confronted with her prior testimony under oath at the Glover trial, she would quickly repudiate the unsworn statement which has been filed in this record.

Of course, counsel should have attempted to secure a pre-trial ruling excluding the utterance, "Hey, Colin," and they can be faulted for not making that attempt. This Court, however, is not at all sure that they would have been successful. The Supreme Court of Louisiana, as noted above, apparently assumed that the statement was inadmissible hearsay and did not discuss the issue.

There are two aspects of Debra Richard's testimony: First, the statement or utterance, "Hey, Colin," made in her presence by someone else and second, the apparent physical response made to that statement by a person that she could not identify. The second part of her testimony, regarding the physical response of the occupant of the automobile, is clearly not hearsay. The witness could certainly testify that she saw Clark's car and that a person in the car waved at them. She would simply be telling what she saw and what the person in the car did. The only portion of the testimony which might be considered hearsay is the utterance, "Hey, Colin."

Hearsay is, by definition, an out-of-court statement offered for the purpose of proving the truth of the matter therein contained. Thus, if Richard had testified that Bonaventure told her that she, Bonaventure, recognized Clark in the passing car, that statement would clearly be hearsay if offered for the purpose of proving

that Clark was the person in the car. That is not the testimony presented, however. Richard's testimony that Bonaventure yelled, "Hey, Colin," at a passing car is not offered for the purpose of proving the truth of Bonaventure's statement. The testimony is offered to explain the actions of the man in the car and it is offered for the *fact* of the utterance. ·See for example, *State v. Brown*, 326 So.2d 839, 843 (La.1976) cert. denied, 429 U.S. 918, 97 S.Ct. 310, 50 L.Ed.2d 284 (1976); *State v. Launey*, 335 So.2d 435, 437 (La.1976); *State v. Singleton*, 321 So.2d 509, 511–512 (La.1975). Evidence that a person responds affirmatively to a particular name tends to show that the person so responding bears that name and such evidence is admissible for the purpose of establishing the identity or name of that person.

Petitioner has not convinced the Court that the utterance of which he complains is inadmissible hearsay nor has he convinced the Court that his court appointed attorneys conducted an inadequate investigation of his case.

b) *Additional Jury Instructions.*

Petitioner claims that the trial judge erred under Louisiana law in instructing the jury regarding the law of principals, which petitioner says had the effect of permitting the jury to convict him under circumstances where the prosecution did not have the burden to prove specific intent to kill beyond a reasonable doubt. Petitioner complains also that the trial judge's instruction on presumed intent was unconstitutional under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Petitioner then argues that counsel should have objected to these inaccurate and unconstitutional jury charges, that their failure to do so prejudiced his case, demonstrates that he received ineffective assistance of counsel and thus, that his constitutional rights were violated.

■ Among the trial judge's instructions to the jury was the following:

"All persons concerned in the commission of a crime whether present or absent

and whether they directly commit the act constituting a crime, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime are principals and are guilty of the crime charged." Tr. 606.

The argument here is similar to Clark's argument regarding the conspiracy charge, discussed earlier and is equally without merit. As noted earlier, the Court repeatedly charged the jury that the defendant could not be convicted unless the state had proved beyond a reasonable doubt that he possessed the specific intent to kill or to inflict great bodily harm. After explaining the elements of the offense charged, the judge specifically told the jury:

"Thus, in order to convict this defendant of first degree murder you must find *that the defendant killed or was a principal in the killing of Fred Schmidt. And that the defendant had specific intent to kill or inflict great bodily harm.* And that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery." Tr. 608.

Counsel argues that, while the law of Louisiana does recognize that all persons participating are principals in a trial, the case of *State v. McAllister*, 366 So.2d 1340 (1978) makes it plain that the aider and abettor may be charged and convicted with either a higher or lower degree of crime, "depending on the mental element proved at trial." This, of course, is correct. The petitioner at his trial could be convicted only upon proof that he personally possessed the specific intent to kill or inflict great bodily harm and the judge's instructions to the jury, viewed as a whole, make that abundantly clear. The words quoted immediately above make it plain that in order to be convicted as a principal, the jury must find that the defendant had specific intent to kill or inflict great bodily harm. The charge was accurate in accordance with Louisiana law and counsel had no cause to object.

After defining criminal intent, the trial judge added the following words:

"You may presume that the defendant intended the natural and probable consequences of his acts." Tr. 611.

Petitioner argues that this charge is unconstitutional under *Sandstrom v. Montana*, supra, that the prosecution relied upon the language in securing his conviction and that he received ineffective assistance of counsel because no objection was made.

 While it is probably better practice to avoid any jury instruction regarding "presumed intent," it is necessary for us to here determine the nature of presumption described and the manner in which the jury could have interpreted it. *Sandstrom v. Montana*, 99 S.Ct. at 2454.

A deprivation of due process is indicated only where, under the circumstances of the trial, the jury could have construed the instruction as conclusive or binding upon them or as shifting to the defendant the burden of disproving specific intent. *Sandstrom v. Montana*, 99 S.Ct. at 2459.

 In *Sandstrom*, supra, the defendant admitted that he killed the victim but denied that he possessed the requisite criminal intent under state law and offered testimony relating to his mental capacity. The jury was instructed that, "The law presumes that a person intends the ordinary consequences of voluntary acts." The Court held that under the circumstances of that case (as admitted by the prosecution) it was possible that the jury believed that they were required to apply the presumption.

Initially, we note that the instruction given in Clark's case contains no mandatory language. "You may presume," certainly does not indicate a conclusive presumption. Moreover, although the judge used the word "presume", the context of the entire charge indicates that he really meant "infer", as he also explained inferences from evidence. While there is a technical distinction in law between a presumption and an inference, there is no language in the charge to this jury which indicates that they were required to apply any presumption or to make any inference.

Second, there was no issue raised regarding Clark's mental capacity to entertain a requisite intent. Clark did not admit any participation in the crime, as did Sandstrom, and the prosecution here simply argued that the person or persons who stabbed Fred Schmidt thirty or thirty-five times with a butcher knife and then shot him in the back of the head with a .38 caliber pistol had the specific intent to kill or to inflict great bodily harm—a not unreasonable inference. Cf. *United States v. Spiegel*, 604 F.2d 961, 968–970 (5th Cir. 1979) The prosecution argued other evidence to the jury to convince them that Clark was one of the people who actually did those acts. Had there been some issue regarding Clark's mental capacity to entertain criminal intent, his argument would be stronger.

This charge is to be contrasted with the charge given in *Tyler v. Phelps*, 643 F.2d 1095 (5th Cir. 1981) Where the trial judge told the jury that the law *requires* the jury to presume that the defendant intended the natural and probable consequences of his act.

Under the facts and circumstances of this case, the jury charges do not usrp the fact finding province of the jury nor do they shift the burden of going forward with the evidence to the defendant. If error, this instruction was harmless and petitioner's counsel were not derelict in failing to object at the time the charge was given.

c) *The Blood Sample.*

 It will be recalled that Clark's hand had been cut and was bleeding when his roommates, Pittman and Reid, saw him after the crime had been committed. The prosecution moved for and obtained an order of court authorizing it to secure a sample of Clark's blood. The results, which were offered to the jury, indicated that blood of the same type as Clark's was found at the scene of the crime, along with the blood of the victim.

Petitioner argues that the prosecution simply used a form motion and made no

substantial showing of need to obtain the blood sample and that his counsel should have but did not object.

The record does not disclose what evidence, if any, was presented to the court in support of the motion and Clark's attorneys were not sure, when they testified in this Court, whether they objected or whether they did not. Both felt, however, that objection would have been futile and time wasting and this Court agrees.

Assuming that *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), cited by petitioner as authority, does indeed establish the principal advanced, court appointed counsel is not required to contest each and every motion or request made by the prosecution. Here the police authorities had evidence that a person whose blood type was different from that of the victim's had been at the scene of the crime, that Clark had received a cut on his hand the night of the crime and that samples of the same blood type as those taken at the scene of the crime had been found in Clark's apartment after he fled Baton Rouge. If the state's form motion was technically inadequate to justify the order for the blood sample, it could easily and quickly have been made complete in every detail. There was ample justification for the prosecution to obtain a blood sample and the court would most assuredly have ordered it. Counsel were correct in not wasting time by mounting a time consuming attack which would ultimately have proved fruitless.

### d) *Failure to Testify.*

Clark testified at the April 23, 1981, hearing before this Court that he repeatedly told his attorneys that he wanted to testify at the trial and wanted to tell his story to the jury. His story basically was that he was not with Glover during the early part of the night of the crime but that he saw Glover later, that Glover told him "what had happened at the Red Lobster," that Clark got mad, got into a fight with Glover and cut his hand on a piece of metal (a stop sign) during the fight.

Clark testified at the hearing before this Court that his attorneys repeatedly advised him against testifying, among other reasons, because the prosecution would cross examine him about his prior history as a drug user. Mr. McKenzie and Mr. Wilkinson, the attorneys, both testified that they strongly advised Clark against taking the witness stand at his trial. They both testified that despite their efforts to do so, they were unable to corroborate Clark's alibi that he had been to a number of different bars before he met Glover at a time after the killing and that, in their considered opinion, Clark would make a mistake if he testified.

Petitioner argues that because his case was a capital one, he had a personal and fundamental right to testify which could be waived only by him personally, not by counsel, and that counsel were ineffective in "preventing him" from testifying.

Accepting for purposes of argument petitioner's novel proposition, petitioner must show not only that this right to testify was denied to him but that his trial was thereby rendered so fundamentally unfair as to constitute a violation of the due process clause caused by the ineffectiveness of his attorneys. The obvious fact that he was, indeed, convicted and sentenced to death is insufficient to establish the constitutional violation.

According to the evidence presented to this Court, petitioner basically desired to shift the blame for the death of Fred Schmidt to his roommate, Glover, and he wanted to deny any participation in the murder. As previously noted, his attorneys had been unable to corroborate any portion of his proposed alibi and it is obvious that if Clark had testified, he would have admitted one crucial fact, that is, that he was with Glover during the night of the crime. He would have been subjected to cross examination about his reasons for flight after the commission of the crime and his request to his roommates that they lie about the time when he left as well as about how and why his automobile was found in Florida, about why his knife was used in the killing of

Fred Schmidt and all other aspects of the circumstantial case.

There is nothing in the record to indicate that the jury's verdict would likely have been different in any respect had Clark testified. On the contrary, his counsel gave him sound advice; had he testified, skilled cross examination might have secured sufficient admissions to fill a substantial number of the possible holes in the state's case.

■ Finally, the record does not show that counsel "prevented" him from testifying, only that they strongly advised it. Had Clark wanted to insist upon taking the stand, he could have brought the matter to the attention of the court, as he did later when he insisted upon personally addressing the jury on the punishment phase of the trial. This Court cannot conclude that counsel for Clark committed error in advising him not to testify nor that his failure to testify resulted in damage to his case. The Sixth Amendment assures a defendant counsel reasonably likely to render reasonably effective assistance; it does not guarantee error free counsel, nor does it ensure success. Counsel's performance must be measured against the entire record and all of the circumstances. Certainly Clark's counsel made mistakes, some of which we have noted, but factual decisions do not render assistance ineffective simply because in retrospect it can be argued that counsel chose the wrong course. *Nelson v. Estelle*, 642 F.2d 903 (5th Cir. 1981); *Beckham v. Wainwright*, 639 F.2d 262 (5th Cir. 1981); *Baldwin v. Blackburn*, 653 F.2d 942 (5th Cir. 1981). In a habeas corpus proceeding the burden of proof is upon the petitioner. *Jones v. Estelle*, 632 F.2d 490 (5th Cir. 1981) cert. denied, —— U.S. ——, 101 S.Ct. 1992, 68 L.Ed.2d 307 (1981).

This Court has carefully examined the entire record of the state court proceedings and has carefully considered the testimony of all the witnesses who appeared at hearings conducted in this Court. That evidence simply does not illustrate that the performance of petitioner's counsel, even by hindsight, was so ineffective as to deprive him of his constitutional right to reasonably effective assistance of counsel.

Petitioner's claim of ineffective assistance of counsel has not been established nor has he shown error of constitutional magnitude during his trial.

Petitioner mentioned other alleged errors in his petition for habeas corpus; however, only the issues discussed here were included in the briefs filed. Accordingly, the Court assumes that all issues not covered by the briefs have been abandoned.

For the foregoing reasons, there will be judgment dismissing petitioner's application for habeas corpus.