[Cite as *State v. McCrary*, 2017-Ohio-8701.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                          :
                                        :     Case No. 16CA3568
    Plaintiff-Appellee,                 :
                                        :
    vs.                                 :     DECISION AND JUDGMENT
                                        :     ENTRY
JASON A. MCCRARY,                       :
                                        :
    Defendant-Appellant.                :     **Released: 11/22/17**
_____

APPEARANCES:

Robert Alan Brenner, Robert Alan Brenner, LLC, Dayton, Ohio, for
Appellant.

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Pamela C.
Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for
Appellee.
_____

Per Curiam.

{¶ 1} Jason A. McCrary appeals from his convictions in the Ross

County Court of Common Pleas after he was found guilty, by a jury of his

peers, of the murder of Timberly Claytor.  On appeal, Appellant contends

that 1) the trial judge abused his discretion when he replaced Juror 23 with

an alternate pursuant to R.C. 2945.45; and 2) his conviction is against the

manifest weight of the evidence.  Because we conclude that replacing a juror

who is unable to perform his/her duties, even during deliberations, is within

the sound discretion of the trial court, and because the trial court did not abuse its discretion, Appellant's first assignment of error is overruled. Similarly, because we conclude Appellant's conviction for murder was not against the manifest weight of the evidence and that the jury did not lose its way in finding Appellant guilty, Appellant's second assignment of error is overruled. Accordingly, having found no merit in either of the assignments of error raised by Appellant, the decision of the trial court is affirmed.

FACTS

{¶ 2} Jason McCrary was indicted for murder, a special felony in violation of R.C. 2903.02, on July 24, 2015. The indictment also contained firearm and repeat violent offender specifications. The charge stemmed from an investigation related to the death of Timberly Claytor, whose body was found in the gravel lot of an abandoned dairy bar located on Trego Creek Road in Massieville, Ohio, on May 29, 2015. It was ultimately determined that the cause of Claytor's death was the sustainment of three gunshot wounds to the head, one of which severed her brain stem. The record indicates that Appellant was a suspect in the case from the beginning of the investigation due to the fact that law enforcement's interviews of Ms. Claytor's friends led them to view surveillance tapes from two area gas stations, which included video footage of Appellant, as well as his vehicle, at

the same location where Claytor was last seen.[1]  Appellant, however, was not initially charged with Claytor's murder, but instead was arrested for failure to register in connection with a prior conviction.  It appears Appellant was not formally charged with the murder of Claytor until a woman by the name of Jessica Lowry came forward as an eye witness to the murder.

{¶ 3} Appellant denied the charge contained in the indictment and the matter proceeded to a five-day jury trial beginning on July 11, 2016.  The State presented several witnesses at trial, including Jillian Adkins and Maria Catron, who were with Ms. Claytor just before her disappearance in the early morning hours of May 29, 2015, as well as Jessica Lowry, who claimed to be an eye witness to the murder.  The State also presented the testimony of Appellant's girlfriend, Nicole Perkins, her son, Myray Perkins, and her sister, Ebony Perkins.  Additionally, the State presented testimony by John Winfield, a detective with the Ross County Sheriff's Office, Dr. Bryan Casto, a forensic pathologist and Deputy Coroner with the Montgomery County Coroner's Office, Nicole Law and Hallie Garofalo, both forensic scientists with the Ohio Bureau of Criminal Investigation and Identification (hereinafter "BCI"), Todd Fortner, a special agent in BCI's Crime Scene Unit, and finally, Matthew White, a firearm examiner in BCI's

---

[1] As will be discussed in more detail below, the vehicle Appellant was driving was a white, four-door Chevrolet Impala, which was owned by his girlfriend, Nicole Perkins.

Forensic Laboratory. Appellant presented four witnesses, including Robert Moledor, a detective with the Columbus Division of Police who is also assigned to the Cellular Analysis Survey Team Unit, which is part of an FBI task force/Columbus Violent Crime Squad. Appellant's other witnesses included his friends, Carol Jordan and Seth Cottrill, as well as himself.

{¶ 4} Jillian Adkins testified Timberly Claytor was at her house the night before she disappeared and that Claytor and Maria Catron left around 2:00 or 2:30 a.m. to get jugs of water and cigarettes at a nearby store, either Valero or Speedway, and that she never saw her again. She said she reported Claytor missing the next day at about 5:00 p.m. after she heard a body had been found. Maria Catron testified that she was at the Valero station with Claytor when a man in a white car pulled up and started talking to Claytor. She testified he told them his name was Curtis Woodfork. She testified that Claytor got in the car with him and although Catron initially started walking, she then got into the car with them and they all drove to Speedway. She testified that they then took her to her house to get water and that while she was inside Claytor came to the door and told her she would be back in a few minutes, but that she never came back. She testified on cross examination that it was her understanding that Claytor and Appellant were going to go have sex and do drugs together.

{¶ 5} Jessica Lowry testified that she was at a party at her friend Carol Jordan's house, which is located in Massieville, on the night in question. She testified that prior to that time Appellant was an acquaintance of hers who lived across the street from Jordan. She testified that Appellant stopped by that night and had Claytor in the car, who Lowry testified she had never met. Lowry testified that she had been drinking and was drunk that night, and that she left the party with Appellant, Claytor, Cottrill and Jordan to go to a park in Massieville. She testified that Appellant was driving a white, four-door car and that Claytor was in the front seat while the rest were in the back seat. She testified that when they got to the park and got out Jordan informed her of a plan to "jump" Claytor to take her money and that although she attempted to assist Jordan in this plan she was too drunk to do so, and Cottrill pulled them apart. She said Appellant and Claytor then went to the car and that she saw Claytor hand Appellant money out of her pocket. She testified that Appellant and Claytor then got into the car and had sex, while the others went and climbed on a "tower thing" located at the park, which the record reveals was Scioto Trails Park. Lowry testified that after Appellant and Claytor got out of the car, they all talked and made up and then Claytor and Appellant began smoking crack while the others, including

Lowry, were drinking. She testified they all got back into the car in the same seating arrangement and headed back towards Massieville.

{¶ 6} Lowry testified that as they were driving, Appellant got mad at Claytor because she smoked the last bit of crack and he began cussing at her. She testified that Appellant and Claytor began arguing and that Appellant pulled out a gun while he was still driving. She testified that as they approached an old building, which was an old dairy bar in Massieville, Claytor tried to open the car door and get out and Appellant shot her. She testified that Appellant actually shot her as she was halfway out of the vehicle, that she fell, got back up and he shot her again. She testified that after four or five shots Claytor didn't move anymore. She testified that Appellant then pointed the gun at them and told them to move the body. She testified they moved Claytor's body into the grass and they all got back into the car and went to Lowry's house, where Appellant threw the gun into water, which the record indicates was Paint Creek. She testified Appellant then drove them back to Jordan's house and threatened them not to say anything. She testified that she later came forward because it was the right thing to do.

{¶ 7} On cross-examination, the defense questioned Lowry extensively about inconsistencies between her trial testimony and her prior

statements given to Deputy Winfield. However, those statements were never actually introduced into evidence. Lowry tried to explain that when she was initially interviewed by Winfield, her sister was with her and she was scared she was disappointing her sister. She conceded on cross that she had been drinking and doing drugs on the night in question, but she testified she didn't do any drugs from the time she got into the car with Appellant and that she stopped drinking when Claytor was shot. She also testified on cross that she had been "drinking hard" and had been taking pills when she talked to Deputy Winfield. With regard to the actual shooting, Lowry testified on cross that Claytor had her foot out while the car was still moving and that Appellant shot her. She testified Claytor fell, was "leaning out," that she tried to pull herself back up on the car door, but that Appellant moved, got out of the car and shot her again over the top of the car from the driver's side. She said Claytor then stopped, went down, and that Appellant walked around the front of the car and shot her again because she moved.[2] She testified that Appellant made them move her body, but clarified that Jordan did not help.

---

[2] Lowry broke down on the stand while testifying upon cross-examination and the trial was actually recessed for the night so she could review her several-hours-long interview with Deputy Winfield in order to refresh her recollection. There was detailed questioning on cross as to the time of day of the shooting, as reported by Lowry to Winfield, and also as to whether Claytor was shot in the side or the back of the head. Lowry's testimony is, at times, hard to follow, which may be explained by multiple references throughout the transcript during side bar discussions between the court and counsel that Lowry is low-functioning, inarticulate and has deficits, possibly from her extensive drug use.

{¶ 8} Myray Perkins, Appellant's girlfriend's son, testified that he lives in Massieville with his mother, grandfather and Appellant.  He testified that Appellant goes by Curtis Woodfork on Facebook and that he saw Appellant with what he thinks was a .380 caliber gun with a silencer on it a week prior to the shooting.  As to the events of the night in question, he testified that Appellant left in his mom's car that night and did not come back until between 4:00 or 4:30 a.m., at which time he came in, took a shower and went to sleep.  He also testified he saw Appellant cleaning out the car the next morning and that Appellant told him he had spilled coffee in it.  Nicole Perkins testified that when Appellant picked her up at her mother's in the car the day after the murder, there was a rug over the front passenger seat and two odd holes by the seatbelt.  She testified Appellant told her he dumped coffee in the seat and that he did not know anything about the holes.  She also testified Appellant used the name Curtis Woodfork on Facebook.

{¶ 9} Deputy John Winfield testified regarding his investigation of Timberly Claytor's death.  He testified that he responded to the scene where Claytor's body was found, where he observed flip-flops in a gravel lot, blood, and a blood trail leading to the east side of the building where the victim was located in a tall, weeded area with her head underneath a

guardrail. He, along with the Ross County Coroner's Office and BCI, processed the crime scene, and he also attended the autopsy of Claytor, which revealed Claytor had sustained three gunshot wounds to the head. He testified he interviewed Adkins and Catron and obtained video surveillance from Valero and Speedway. He testified that when he eventually located Appellant and the vehicle, he noticed a blood smear on the bumper of the car. He testified regarding the process used to obtain DNA samples from the vehicle, the victim and Appellant, as well as the bullets that were eventually recovered from the car, the scene and Claytor's body. He testified that during the search of the vehicle, carpet saturated with blood was found underneath the front passenger seat once the seat was removed. He also testified that although Paint Creek was searched, the gun was never recovered.

{¶ 10} Dr. Bryan Casto performed Claytor's autopsy. He testified that Claytor had four gunshot injuries, three to her head and one to her hand. He testified as to the trajectory or path of the bullets through her body and he testified that there was one entrance wound in front of Claytor's left ear, one behind her left ear and one below her left ear. He testified that one exit wound was immediately beneath her right ear and one was on her right upper cheek. One bullet was retained in Claytor's head and was found at the

base of her skull, where her internal ear bones would have been. Casto testified that the trajectory of the path of the bullets through Claytor's body collectively indicated a left to right, upward, and back to front trajectory. Casto also testified that he observed very dense gunpowder stippling or tatooing, which implies the weapon was discharged very close to Claytor. He testified that although he determined the cause of death to be multiple gunshot wounds to the head, he could not determine whether the shots were fired in quick succession. Importantly, he testified that each shot was "potentially lethal or life ending." He explained that two of the shots could have caused death due to the blood loss they would create, albeit a slower death than the shot that cut the brain stem in half, which he explained would prohibit any voluntary movement thereafter. He testified that he could not, however, determine the sequence of the shots, or which injuries they inflicted in what order. He also importantly testified that the autopsy revealed blood in Claytor's lungs, which would have been breathed in as opposed to being drained from her injuries, which Casto explained is an indicator of life after sustaining injury. He further testified that he collected genital and anal swabs from Claytor, which he submitted to the Ross County Sheriff's Office.

{¶ 11} Forensic Scientist Nicole Law testified that she reviewed swabs and a rape kit, which were submitted to BCI for testing, for the presence of blood and semen. She testified that she confirmed the presence of both and generated a report, which was admitted into evidence. Forensic Scientist Hallie Garofalo examined items of evidence submitted to BCI in order to generate DNA profiles and make comparisons. She testified that she completed two rounds of testing in the case at issue. She testified that the first round of testing confirmed the presence of Appellant's DNA on the driver's side, interior, front door of the car, the gearshift, and the steering wheel. She testified that her testing confirmed the presence of Claytor's blood on the pillar of the vehicle and the steering wheel. She testified that the rape kit and vaginal samples taken from Claytor contained Appellant's DNA. She testified to another round of testing that she performed which confirmed the presence of Claytor's blood on Appellant's shoes and the passenger seat carpet of the car.

{¶ 12} BCI Special Agent Todd Fortner testified regarding his involvement in the investigation and processing of the crime scene. He testified that when searching the vehicle, he observed a blood stain, or more specifically a drip stain that arrived through gravity, along the running board of the passenger side that could have only been deposited with the door

open. He further testified to blood spatter stains on the B pillar on the passenger side of the car where the seat belts are located. He explained that the location and shape of the stains showed directionality, specifically a front to rear direction. He explained that a spatter stain is a droplet of blood that has been propelled through the air by an external force applied to a source of liquid blood. He explained that as the droplet hits the surface, it will disperse into an oval shape and a little of the blood will continue on and make a little tail. He testified that here he observed an oval stain with a tail on the right going up, which indicates the source was in the front and was propelled up and backward. He also testified regarding the bullet holes in the B pillar of the passenger side of the car. Importantly, he testified that his inspection of the bullet entrance points reveals the bullets "went in pretty much perpendicular to the passenger side of the vehicle."

{¶ 13} Finally, the State presented the testimony of BCI Firearms Examiner Matthew White, who testified that his examination of the three fired bullets submitted for testing were all .380 auto full metal jacketed fired bullets, which were fired from a .380 caliber handgun. He testified he could not determine whether, however, they were all fired from the same gun.

{¶ 14} Appellant presented the testimony of Robert Moledar regarding cellular phone records that were obtained during the investigation.

While Moledar's testimony was quite informative regarding how, generally, cellular calls and activity can be tracked and analyzed, it was ultimately inconclusive with regard to the calls placed on the night in question, who placed them, and from where they were placed.

{¶ 15} Appellant also presented testimony from his friends Carol Jordan and Seth Cottrill, both of whom Jessica Lowry alleged were present and in the car the night Claytor was murdered. Both Jordan and Cottrill denied being present that night. Jordan testified that Appellant was like family to her. She also denied being part of a plan to rob Claytor on the night in question. Cottrill testified he was friends with Appellant. He also admitted that he had a substantial prior record, including aggravated robbery, aggravated burglary, felonious assault, and was on post-release control at the time of the murder, which prohibited him from doing drugs and associating with known felons.

{¶ 16} Finally, Appellant testified in his own defense at trial. He testified to a much different story that the one told by Jessica Lowry. He admitted he sometimes goes by the name Curtis Woodfork and that he picked up Timberly Claytor in Chillicothe in Nicole Perkins' car on the night in question. He testified that he paid her $20.00 in exchange for sex. He testified that while his purpose was to drive to his cousin's house to have sex

with Claytor and then go home, Claytor told him she needed to meet someone at Poling Park. He testified that while driving there, she told him to pull over into the Anderson Drug Store parking lot, where a "dude" came out and walked up to the car window, leaned in and said "What's up Jay?" Appellant testified he then realized the person's name was "Dollar Bill," aka Ernest Moore. He testified that Moore persuaded him to give him a ride to Massieville in exchange for sharing his $30.00 worth of marijuana. Appellant testified they smoked marijuana while driving to Massieville, and that he ended up pulling into the driveway of the home he shared with Nicole Perkins, where her son Myray and father were inside asleep, and had sex in the backseat of the car with Claytor while Moore essentially just hung around outside, as his other ride never came. He testified that he then went into the house to shower and then the three of them got back into the car.

{¶ 17} He admitted he was driving, Claytor was in the front, and claimed that Moore was sitting in the back seat behind Appellant, with his legs behind the front passenger seat.[3] He testified that as he was heading back to Chillicothe, he heard Moore tell Claytor that there was stuff missing from his house after she had been there and that Claytor denied taking anything. He testified that the two began bickering, that he saw Claytor

[3] He explained that Moore was sitting this way as the front passenger seat was pushed back because Myray had been riding in the front previously, and was very tall. There is no explanation as to why the seat remained in that position while Appellant and Claytor were allegedly in the backseat having sex.

raise her left hand, heard a "pop, pop, pop," and saw a flash of light out of the corner of his eye.  He testified that he slammed on the breaks and that Claytor was leaning against the side of the car and wasn't moving.  He testified that Moore then hit him on the shoulder with a pistol and told him to keep going, and then told him to pull into a gravel lot by a dairy bar.  He testified Moore got out and opened Claytor's door and that Claytor fell out into the gravel.  He testified that Moore dragged her to the side of the building and then got back into the back of the car.  He testified that the two of them just sat there for ten to fifteen minutes, at which point a truck pulled up.  He said Moore threatened him and then got out and left in the truck.  Appellant denied ever taking Claytor to a park and denied that anyone but those three were in the car.  Appellant also admitted that he had prior convictions for unlawful conduct with a minor, aggravated robbery, receiving stolen property, complicity to burglary and failure give notice for change of address.  He also admitted that he lied to Nicole Perkins about the details of the night in question both verbally and in a letter written to her from the jail, and that he previously lied as a sworn witness before a jury in another case, because he was afraid that his family would be hurt if he testified truthfully.

{¶ 18} The case was submitted to the jury for deliberations. After deliberations began, Juror 23 sent a message to the court asking to be excused. Upon questioning by the court with counsel for both parties present, it was determined the juror could not continue her service. As a result, she was replaced with an alternate juror and the jury, as a whole, was instructed to begin their deliberations anew. The jury ultimately determined Appellant was guilty of the murder of Timberly Claytor. Appellant now appeals his conviction to this Court, setting forth two assignments of error for our review.

## ASSIGNMENTS OF ERROR

"I.    THE TRIAL JUDGE ABUSED HIS DISCRETION WHEN HE REPLACED JUROR 23 WITH AN ALTERNATE PURSUANT TO R.C. 2945.45.

II.    THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## ASSIGNMENT OF ERROR I

{¶ 19} In his first assignment of error, Appellant contends the trial judge abused his discretion when he replaced Juror 23 with an alternate pursuant to R.C. 2945.45. More specifically, Appellant contends that the trial court's decision to remove the only African American on the jury panel, who had disclosed during voir dire that she had previously held out against a conviction in a felony criminal case, was an abuse of discretion. Appellant

also argues the trial court's refusal to allow defense counsel to discuss the matter at sidebar, or to permit the juror to explain herself, before removing the juror constituted a further abuse of discretion. The State responds by arguing that because the record shows the juror was unable to perform her duties, and because the trial court complied with the process set forth in R.C. 2945.29 and Crim.R. (G)(1), the trial court did not abuse its discretion in removing her and replacing her with an alternate juror. Based upon the following, we agree with the State.

{¶ 20} As conceded by Appellant in his brief, the decision to remove a juror lies in the sound discretion of the trial court. In *State v. Scarbrough*, 4th Dist. Washington No. 97CA45, 1998 WL 823789, *4, this Court explained as follows:

> "After trial commences, the court may discharge a juror if he is unable to perform his duty. R.C. 2945.29. Whether a juror can perform his duty lies within the sound discretion of the trial court. *State v. Hopkins* (1985), 27 Ohio App.3d 196, 197, 500 N.E.2d 323, citing *United States v. Spiegel* (C.A.5, 1979), 604 F.2d 961, 967."

" 'Although the abuse of discretion standard usually affords maximum [deference] to the lower court, no court retains discretion to adopt an incorrect legal rule or to apply an appropriate rule in an inappropriate manner. Such a course of conduct would result in an abuse of discretion.' " *See 2-J Supply, Inc. v. Garrett & Parker, L.L.C.*, 4th Dist. Highland No.

13CA29, 2015-Ohio-2757, ¶ 9.  When applying the abuse-of-discretion standard of review, appellate courts must not substitute their judgment for that of the trial courts. *See In re Jane Doe 1*, 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).  Furthermore, an appellate court must presume that the findings of the trial court are correct because the finder of fact is best able to observe the witnesses and to use those observations to weigh witness credibility. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984); *see also Mahlerwein v. Mahlerwein*, 160 Ohio App.3d 564, 2005-Ohio-1835, 828 N.E.2d 153, ¶ 19 (4th Dist.).

{¶ 21} R.C. 2945.29, entitled "Jurors becoming unable to perform duties" provides as follows:

> "If, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged. If, after all alternate jurors have been made regular jurors, a juror becomes too incapacitated to perform his duty, and has been discharged by the court, a new juror may be sworn and the trial begin anew, or the jury may be discharged and a new jury then or thereafter impaneled."

Crim.R. 24 entitled "Trial jurors" is also pertinent and provides in section (G)(1), which governs alternate jurors in non-capital cases, as follows:

> "The court may direct that not more than six jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to

consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors. The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. *If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.* Each party is entitled to one peremptory challenge in addition to those otherwise allowed if one or two alternate jurors are to be impaneled, two peremptory challenges if three or four alternate jurors are to be impaneled, and three peremptory challenges if five or six alternative jurors are to be impaneled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by this rule may not be used against an alternate juror." (Emphasis added).[4]

Thus, it is within a trial court's discretion to remove a juror unable to perform his or her duties, even after deliberations have begun, provided the court instructs the jury to begin its deliberations anew. R.C. 2945.29; Crim.R. 24(G)(1); *see also State v. Sallee*, 8 Ohio App.2d 9, 11, 220 N.E.2d 370 (1966) (holding that discharge of an individual juror for illness of an immediate family member *during any state of a criminal trial* is within the sound discretion of the trial court.).

---

[4] Prior to the revision of this rule in 2008 there was no provision for removal and replacement of jurors unable to perform their duties after deliberation had already begun; however, the current version of the rule expressly allows such action, provided the trial court instructs the jury to begin its deliberations anew.

{¶ 22} Here, a review of the record reflects that Juror 23 sent a note to the trial court during the deliberations asking to be excused. The trial transcript indicates the note stated as follows: "Please ask the judge to excuse me, I can't do this, really, making me upset, and not feeling very good." Upon receiving this message from the juror, the trial court went on the record, with counsel for both parties present, shared the contents of the message, and informed counsel of its intention to bring the juror out by herself to "further explain" what she meant by stating she was not feeling very good. Neither counsel objected to this plan, but defense counsel stated the court should caution the juror not to disclose the status of deliberations.

{¶ 23} The juror was subsequently brought into the courtroom. The trial court cautioned her not to disclose the status of deliberations and inquired as to why she was upset and what "not feeling very good" meant. The following exchange took place on the record:

"Juror 23:    Your Honor, I can't go --

The Court:  I can barely hear you.

Juror 23:    I can't, I cannot . . . .

The Court:  Are you physically unable to do it?

Juror 23:    I can't handle it very well, just can't do this.

The Court:  Are you physically ill, physically unable to do it,
                    that's my question.

Juror 23:      Very, very weak.

The Court:   I understand you feel awful.  There are a lot of unpleasant things that we all do in our life.  I'm guessing, all I'm asking you are you telling me that you are just not, you're physically not able to do this, that's what I'm getting at.

Juror 23:      Yes, I'm unable to do this.

The Court:   So you're indicating that you are physically not able to do it, okay?  Okay.  Well thank you, I very much appreciate your honesty, your candor, and talking with me about this.  I'm going to --

Juror 23:      Can I say something?

The Court:   You may say something.  Do not tell me, I don't want to know what's going on in there though.

Juror 23:      I can't take that.

The Court:   What's that?

Juror 23:      Can I say . . . .

The Court:   You can say as long as you're not disclosing what's going on in that room.

Juror 23:      Can I say what I said?  About me?

The Court:   You said you wanted to tell me something.

Juror 23:      Can I tell you what I . . . .

The Court:   What you?  I don't want to know --

Juror 23:      What I came up with or what I decided within myself?

The Court:    No, I don't want to know your decision, I don't
              want to know where you are or anything --

Juror 23:     Okay, okay.

The Court:    In fact I'm going to instruct you that you are not to
              discuss anything that occurred in that room or
              what's going on until this case is concluded.

Juror 23:     Okay.

The Court:    So I'm going to --

Juror 23:     I get that.

The Court:    I'm going to --

Myers:        Your Honor, may we approach, maybe one time
              before you make the final decision?

The Court:    No.  I don't need anyone to approach to make my
              decision on this.  I'm going to release you.  Do not
              discuss this case or anything about, kind of like
              what I told the witnesses, or anything about this
              case or your service as a juror until the jury
              reaches a verdict and then if you wish to discuss
              your jury experience you may do so.

Juror 23:     Okay."

{¶ 24} The trial court's questioning of Juror 23 concluded at that point

and she was removed from the jury.  Immediately thereafter, the trial court

stated as follows on the record:

          "I would note that Ohio Revised Code Section 2945.29
          indicates what should happen when jurors unable [sic] to
          perform their duties, as such I am substituting in an alternate, it
          will be the first alternate.  I'm going to bring in [sic] the entire

> jury back out and instruct them that they must start their deliberations anew as if this is the beginning of their deliberations."

The Court thereafter instructed the jury accordingly.

{¶ 25} At no point did defense counsel object to the removal of Juror 23 or the replacement by an alternate juror. Thus, although we generally review a trial court's decision to remove a juror for an abuse of discretion, because Appellant did not object the removal of Juror 23 at the trial court level, we must analyze Appellant's assignment of error under a plain error standard of review. Appellate courts take notice of plain error with the utmost of caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78; *State v. Patterson*, 4th Dist. Washington No. 05CA16, 2006-Ohio-1902, ¶ 13. Plain error should only be noticed if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *See State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139, ¶ 66. The Ohio Supreme Court recently stated that appellate courts should be conservative in their application of plain-error review, reserving notice of plain error for situations that involve more than merely theoretical prejudice to substantial rights. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 30.

{¶ 26} Here, Appellant contends that the trial court erred and abused its discretion when it replaced Juror 23, arguing that such removal is improper in light of the fact that Juror 23 was the only African American juror on the panel, and had also previously held out on a conviction in a felony criminal trial. However, these facts do not factor into the analysis when reviewing a trial court's removal of an individual juror who becomes sick or otherwise unable to serve after already being seated on the jury, but before the verdict is reached. Simply put, the trial court removed Juror 23 upon her request and in response to her statement, after direct questioning in open court, revealed that she was physically unable to continue her service on the jury.

{¶ 27} In making its decision, the trial court was not required to inquire of the juror in person, nor was it required to permit counsel for either party to question the juror, or make an argument to the court. *State v. Owens*, 112 Ohio App.3d 334, 337, 678 N.E.2d 956 (11th Dist.1996) ("The fact that the trial court did not make a more extensive inquiry into the circumstances surrounding the reportedly disabled juror's illness did not demonstrate an abuse of discretion by the trial court."); *State v. Shields*, 15 Ohio App.3d 112, 472 N.E.2d 1110, paragraph three of the syllabus (8th Dist.1984) (Under Crim.R. 24(F) [now (G)] and R.C. 2945.29, the trial court is not

required to examine a reportedly disabled juror personally, nor is it required to offer counsel an opportunity to do so, before replacing a seated juror with an alternate.").  Further, Appellant makes no argument as to how he might have been prejudiced by removing the only African American, hold-out juror on the panel, and we decline to speculate as to how her removal would have prejudiced Appellant. *See State v. Armstrong*, 8th Dist. Cuyahoga No. 81114, 2002-Ohio-6053, ¶ 27 (noting its prior reasoning that the "substitution of an alternate for a regular juror after jury has retired to consider its verdict is not per se plain error, rather, reversal is required only where there is some showing of prejudice.")[5]; citing *State v. Brown*, 108 Ohio App.3d 489, 671 N.E.2d 280 (1995); citing *State v. Miley*, 77 Ohio App.3d 786, 603 N.E.2d 1070, headnote 3).

{¶ 28} As such, and light of the foregoing, we fail to find any error or abuse of discretion, let alone plain error, in the trial court's handling of the removal and replacement of Juror 23.  Accordingly, Appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR II

---

[5] The *Armstrong* decision was issued prior to the 2008 Amendments to Crim.R. 24 which created a process for replacing a disabled juror with an alternate after deliberations had begun.  Thus, prior to 2008, there was no provision under the rules for removal and replacement of a juror once deliberations had begun.  As such, under the reasoning in *Armstrong*, even without an express provision for removal and replacement under such circumstances, such action did not constitute per se plain error, bur rather, required a showing of prejudice in order to justify reversal.

{¶ 29} In his second assignment of error, Appellant contends that his conviction for murder is against the manifest weight of the evidence. Appellant argues that Jessica Lowry's story was "unsupportable and not believable." He also argues that because Carol Jordan and Seth Cottrill denied being present, and because the weapon at issue was never recovered despite a search of Paint Creek, that the manifest weight of the evidence supports his version of events, which claimed that a man nicknamed "Dollar Bill" was the shooter and threatened Appellant to keep him quiet.

{¶ 30} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence and all reasonable inferences, and consider the witness credibility. *State v. Dean*, 146 Ohio St.3d 106, 2015–Ohio–4347, 54 N.E.3d 80, ¶ 151; citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of

credibility.' " *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20; quoting *State v. Konya*, 2nd Dist. Montgomery No. 21434, 2006–Ohio–6312, ¶ 6; quoting *State v. Lawson*, 2nd Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). As the court explained in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, at ¶ 21:

> " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts.
> * * *
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " Quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, fn.3 (1984), quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact-finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24; *accord State v. Howard*, 4th Dist. Ross No. 07CA2948, 2007–Ohio–6331, ¶ 6 ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

**{¶ 31}** Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, 678 N.E.2d 541; quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  If the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *E.g., State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). *Accord Eastley* at ¶ 12; quoting *Thompkins* at 387; quoting Black's Law Dictionary 1594 (6th Ed.1990) (explaining that a judgment is not against the manifest weight of the evidence when " ' "the greater amount of credible evidence" ' " supports it).  Thus, " ' "[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." ' " *State v. Cooper*, 170 Ohio App.3d 418, 2007–Ohio–1186, 867 N.E.2d 493, ¶ 17; quoting *State v. Mason*, 9th Dist. Summit

No. 21397, 2003–Ohio–5785, 2003 WL 22439816, ¶ 17; quoting *State v.*

*Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 WL 487085 (Aug. 12,

1998).  Instead, a reviewing court should find a conviction against the

manifest weight of the evidence only in the " 'exceptional case in which the

evidence weighs heavily against the conviction.' " *Thompkins* at 387;

quoting *Martin* at 175. *Accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721

N.E.2d 995 (2000).

{¶ 32} R.C. 2903.02 defines the crime of murder and provides as

follows:

> "(A) No person shall purposely cause the death of another or
> the unlawful termination of another's pregnancy.
>
> (B) No person shall cause the death of another as a proximate
> result of the offender's committing or attempting to commit an
> offense of violence that is a felony of the first or second degree
> and that is not a violation of section 2903.03 or 2903.04 of the
> Revised Code.
>
> (C) Division (B) of this section does not apply to an offense
> that becomes a felony of the first or second degree only if the
> offender previously has been convicted of that offense or
> another specified offense.
>
> (D) Whoever violates this section is guilty of murder, and shall
> be punished as provided in section 2929.02 of the Revised
> Code."

As indicated above, Appellant was also charged and convicted of a firearm

specification, as well as a repeat violent offender specification.

{¶ 33} Here, Appellant does not argue or address whether the State proved each and every element of the offense of murder and attendant specifications. Instead, he argues that "Dollar Bill," aka Ernest Moore, was the person who shot and killed Timberly Claytor. His argument essentially challenges the jury's ultimate reliance on the testimony of Jessica Lowry and the rejection of his own testimony, and that of Jordan and Cottrill. Thus, his arguments essentially amount to nothing more than a challenge to the jury's credibility determinations. However, as set forth above, credibility is generally an issue for the trier of fact. Additionally, just because the jury apparently resolved the conflicting testimony of Lowry, Jordan, Cottrill and Appellant in favor of the prosecution does not mean that Appellant's conviction is against the manifest weight of the evidence. Further, as set forth above, an appellate court will leave the issues of weight and credibility of the evidence to the fact-finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer, supra,* at ¶ 24; *accord State v. Howard, supra,* at ¶ 6.

{¶ 34} Here, aside from the testimony of Lowry, Jordan, Cottrill, and Appellant, all of whom are, admittedly, less than ideal witnesses, taking into consideration their various shortcomings, which include intellectual deficits, impairment from drug use, prior criminal history, biases and motivations to

lie, there was voluminous expert and forensic testimony which supported Lowry's version of events, or at least did not refute it. Appellant admitted that he picked up Claytor on the night in question and paid her to have sex in his girlfriend's, Nicole Perkins', car. As detailed at great length during the fact portion of this opinion above, the State introduced expert and forensic testimony indicating that Claytor was shot in that vehicle, at close range, and died from multiple gunshot wounds.

{¶ 35} Importantly, the expert testimony could not determine the rapidity in which the shots were fired, or the sequence in which the injuries were inflicted. Thus, the scientific evidence in this case could not rule out that Claytor may have still been trying to move and/or get out of the car after the first shot was fired, nor could it determine the amount of time that blood had time to pool and saturate the carpet before Claytor either got out of or fell out of the vehicle. This is important to the extent that science does not disprove Lowry's version of events, as argued throughout the trial by Appellant.

{¶ 36} Further, expert testimony established the bullet trajectories were from right to left, all entering Claytor's head near her left ear and exiting near her right ear and cheek. As noted by the defense at trial, there is no way to determine which way Claytor's head may have been turned when

she was shot, for purposes of determining whether she was shot from the back by Moore, who was allegedly in the back seat, or by Appellant, who conceded he was in the driver's seat. However, forensic testimony introduced by the State at trial established that an examination of the blood spatter stains on the B pillar of the passenger side of the car reveals directionality and indicates that blood was propelled upward and backward, from the front of the car. Further, and importantly, forensic review of the bullet entrance points on the B pillar of the car indicates that the bullets "went in pretty much perpendicular to the passenger side of the vehicle." Thus, the jury could have reasonably concluded, based upon the expert testimony and forensic evidence presented by the State, that Claytor was shot by an individual in the driver's seat, and Appellant, by his own admission, was driving the car.

{¶ 37} As such, because there is both a factual and rational basis for the jury's conclusion, and because there is no evidence that the jury, as fact-finder, either lost its way or created a manifest miscarriage of justice, Appellant's second assignment of error is overruled. Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.:        Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment and Opinion.
Hoover, J.:      Concurs in Judgment and Opinion as to Assignment of Error II;
                 Concurs in Judgment Only as to Assignment of Error I.

For the Court,

BY:        _____
           Peter B. Abele, Judge

BY:        _____
           Matthew W. McFarland, Judge

BY:        _____
           Marie Hoover, Judge

### NOTICE TO COUNSEL
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**